**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Frank James OCCHIPINTI, Jr., Austin Michael Suttles, Timothy James Spence, Tina Marie Swab, Defendants–Appellants.**

Nos. 92–3179, 92–3184, 92–3185 and 92–3192.

United States Court of Appeals, Tenth Circuit.

July 6, 1993.

David C. Voss, Topeka, KS, for defendant-appellant Frank James Occhipinti, Jr.

Marilyn M. Trubey (Charles D. Anderson, Federal Public Defender, with her on the brief), Branch Chief, Federal Public Defender's Office, Topeka, KS, for defendant-appellant Austin Michael Suttles.

Allan A. Hazlett, Topeka, KS, for defendant-appellant Timothy James Spence.

Matthew B. Works, of Works, Works, & Works, P.A., Topeka, KS, for defendant-appellant Tina Marie Swab.

Richard L. Hathaway (Lee Thompson, U.S. Atty., and Gregory G. Hough, Asst. U.S. Atty., Topeka, KS, on the briefs), Asst. U.S. Atty., Topeka, KS, for plaintiff-appellee.

Before SEYMOUR, ANDERSON, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Defendants Frank James Occhipinti, Jr., Austin Michael Suttles, Timothy James Spence, and Tina Marie Swab appeal their convictions and sentences for offenses arising out of their participation in an illegal marijuana farm located in Anderson County, Kansas.[1] We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and affirm.

## I. BACKGROUND

On the morning of June 24, 1991, Officer Joe Robinson, Undersheriff in Allen County, Kansas, met with Special Agents Rodney Page and Brad Cordts of the Kansas Bureau of Investigation ("KBI") for the purpose of investigating rural property suspected of containing marijuana. Robinson had earlier received information regarding marijuana growing in the region and had aerially surveyed both Allen and Anderson Counties. The officers searched three farms that morning but made no arrests. During the noon break, Robinson received information indicating that the defendants were growing marijuana on their property, which is located approximately one mile west of Kincaid, Kansas in Anderson County.[2] The officers then decided to conduct a "walk-in" search of the defendants' property.

The officers drove north past the defendants' residence and parked in a pasture. They then entered the property and proceeded south along a creekbed and through timber and underbrush. The property was fenced and displayed "No Trespassing" signs. The officers discovered three "cold frames" constructed of wood and plastic in the wooded area behind the farm house. The cold frames housed several hundred cultivated marijuana plants ranging in size from one to five feet. Empty potting soil bags and fertilizer boxes were located outside the cold frames.

The officers then followed a path and green garden hose south into a clearing, where they found shovels, post hole diggers, hand tools, more planted marijuana seedlings, and a flannel shirt. The path and hose continued south to another clearing, where they discovered three "greenhouses" made of tin, wood, and plastic. The greenhouses contained several hundred marijuana seedlings growing in foam cups filled with potting soil. The officers followed the path and hose south until they were several hundred feet from the residence. They observed that the path led to the rear door of the residence and that the hose ran under the house. The officers did not proceed further because the area contained outbuildings and because a fence divided the residence from the pasture. Rather, the officers decided to head back and obtain a search warrant.

As the officers were leaving, they discovered Mr. Occhipinti watching them from a marijuana field near the first clearing. The officers found a marijuana cigarette by his foot

---

1. Although the defendants appealed separately, we address their arguments in a single opinion.

2. Anderson County runs the northern border of Allen County. Kincaid is approximately three miles north of Allen County.

and observed that he was covered with dirt and had mud caked on his fingers, as if he had been digging. The officers placed him under arrest for cultivation of marijuana. The officers also testified that they heard rustling in the woods. Out of concern for Occhipinti's safety, they decided to take him along the path to the house rather than back through the underbrush. Robinson returned to the car and met them at the house. He then radioed for assistance. At that point, the officers decided to enter the residence and perform a "protective sweep," which lasted about two minutes. Soon thereafter, other law enforcement officers arrived, including Kansas State Trooper Heady and Anderson County Sheriff Fred Litsch.[3]

While they were at the residence, a young woman in a van stopped and told the officers that a white male wearing jeans but no shirt had crawled out of the ditch and was running across Highway K–31 towards the Kincaid Co-op Elevator. The man was being chased by two pit bull dogs. He was apprehended running southbound on railroad tracks and told his *Miranda* rights. He identified himself as Timothy Spence, of Hemet, California, and stated that he was headed for a Grateful Dead concert. When asked why he was headed away from Kansas City, where the concert was to be held, Spence had no comment. The officers found a .44 caliber shell in his possession.

Spence and Occhipinti were kept separated at the farm and during their transport to the jail in Garnett, Kansas. At the jail, Occhipinti leaned over and asked Spence, "Who the f___ picked Kansas?" Spence turned away and did not answer.

Agent Page then began preparation for the search warrant. Officer Robinson, however, drove to Mildred, Kansas, located three miles south of the defendants' farm in Allen County, to get ice for the water jugs. As he parked at the store, he noticed a station wagon with California tags. The driver was an older white male; the passenger a young white female. The car also contained two pit bull dogs and several bags of potting soil. Officer Robinson followed them as they drove north back into Anderson County and radioed Trooper Heady at the residence that he believed more occupants of the residence were en route. The car drove past the farm but turned around at the dead-end, at which point Trooper Heady and Officer Robinson stopped the car and arrested the occupants. The driver produced identification as Tony Coffin, although he admitted to being Michael Suttles after requesting the officers to retrieve from the vehicle heart medication prescribed to Suttles. Among the various documents linking Suttles to the marijuana farm was a real estate sales agreement for the property in the name of Tony Coffin. The automobile itself contained a case of foam cups like those used for the marijuana seedlings and eight forty-pound bags of potting soil.

After initially being held in state custody, federal charges were brought against the defendants on August 15, 1991. On August 28, 1991, a superseding indictment charged each of the defendants with one count of conspiracy to possess and distribute marijuana in violation of 21 U.S.C. § 846, one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A), and one count of knowingly using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). A jury convicted the defendants on the first two counts but acquitted them on the third.

On appeal, the defendants make several common arguments and several individual arguments. All of the defendants allege a violation of their rights to a speedy trial and challenge the denial of their motions to suppress evidence based on (1) Officer Robinson's lack of jurisdiction in Anderson County, (2) the invalid search warrant issued for the residence, and (3) the illegal stop of Suttles's vehicle. We also address several individual arguments: (1) Occhipinti appeals the denial of his motion to suppress evidence based on the warrantless protective sweep of the residence; (2) Swab challenges the admission of evidence as co-conspirator statements under Fed.R.Evid. 801(d)(2)(E) and the admission

---

3. Ultimately, a consolidated force of KBI agents, Kansas Highway Patrol Troopers, and Anderson and Allen County deputies was deployed at the defendants' farm.

of certain codefendant statements; and (3) Spence challenges the calculation of his sentence under the United States Sentencing Guidelines.

## II. DISCUSSION

### A. Speedy Trial

 ·Defendants contend that they were denied a speedy trial. They were arrested by authorities from the State of Kansas on June 24, 1991. On August 15, 1991, the United States Attorney for the District of Kansas filed federal charges against the defendants; the state charges were simultaneously dropped. The defendants were tried beginning February 3, 1992, and at that point had been continuously incarcerated for a total of 224 days. They make arguments under both the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, and the Sixth Amendment. We review the trial court's denial of a motion to dismiss under the Speedy Trial Act for an abuse of discretion. *See United States v. McKinnell*, 888 F.2d 669, 675 (10th Cir.1989). The district court's compliance with the requirements of the Act, however, is a question' of law which we review de novo. We review the defendants' Sixth Amendment arguments de novo. *See United States v. Bagster*, 915 F.2d 607, 611 (10th Cir.1990).

"The dual purpose of the Speedy Trial Act is to protect a defendant's constitutional right to a speedy indictment and trial, and to serve the public interest in bringing prompt criminal proceedings." *United States v. Saltzman*, 984 F.2d 1087, 1090 (10th Cir.

1993), *cert. denied,* — U.S. —, 113 S.Ct. 2940, 124 L.Ed.2d 689 (1993). Toward that end, the Act requires that "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date . . . of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The Act, however, does not simply count the days between indictment and trial. Rather, the Act excludes certain periods of that time when computing the allowable delay in commencing trial. *See id.* § 3161(h).

 On appeal, the defendants challenge the exclusion of twenty-eight days based on the government's December 18, 1991 motion for continuance.[4] Section 3161(h)(8)(A) provides for the exclusion of

[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the

---

4. As background, we note several exclusions from the seventy-day limit that apply to this case but which defendants do not challenge on appeal. First, the seventy-days began to run on August 29, 1991, the day after the federal indictment. *See United States v. Anderson*, 902 F.2d 1105, 1108 n. 1 (2d Cir.), *cert. denied*, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 146 (1990). Time spent in state custody on related state charges does not trigger the Speedy Trial Act's clock. *See United States v. Mills*, 964 F.2d 1186, 1189–90 (D.C.Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 471, 121 L.Ed.2d 378 (1992). Thus, the defendants spent 158 days in federal custody prior to their trial.

Second, the defendants filed numerous motions which tolled the seventy-day period. The Act expressly excludes from the seventy-day period "[a]ny period of delay resulting·from other

proceedings concerning the defendant, including but not limited to delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F); *see United States v. Willie*, 941 F.2d 1384, 1387 (10th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1200, 117 L.Ed.2d 440 (1992). Pursuant to § 3161(h)(7), all of these motions tolled the seventy-day period as to the other defendants, *see United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir.1990); *United States v. Fuller*, 942 F.2d 454, 457 (8th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991), *and cert. denied*, — U.S. —, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992), yielding eighty excludable days. Subtracting these days, the defendants spent seventy-eight days in federal custody prior to their trial.

record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial. 18 U.S.C. § 3161(h)(8)(A). The Act then lists various factors for the court to consider regarding the "ends of justice." *Id.* § 3161(h)(8)(B).[5] Of particular relevance here is the instruction that, although a court may consider whether in a complex, multi-defendant case "it is unreasonable to expect adequate preparation for [the trial] within the time limits established," *id.* § 3161(h)(8)(B)(ii), or whether in an ordinary case failure to grant the continuance would deny the government "continuity of counsel" or the "reasonable time necessary for effective preparation, taking into account the exercise of due diligence," *id.* § 3161(h)(8)(B)(iv), the court may not grant an excludable continuance "because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government," *id.* § 3161(h)(8)(C). Taken together, then, these subsections empower the court to grant an excludable continuance under § 3161(h)(8) where the government needs additional time to prepare, so long as the government has not created that need itself through lack of diligence.

■ When considering such a continuance, the trial court must make explicit findings regarding why granting the continuance will strike a proper balance between the ends of justice and the best interest of the public and the defendant in a speedy trial. *See United*

States v. Doran, 882 F.2d 1511, 1515 (10th Cir.1989). The purpose of this requirement is to ensure that the trial court carefully weighs the relevant criteria and to provide a reviewable record for appeal. *Id.* "Failure to address these issues on the record creates the unnecessary risk of granting continuances for the wrong purposes, and encourages overuse of this narrow exception." *Id.* In setting forth its findings, however, the district court need not articulate facts "which are obvious and set forth in the motion for the continuance itself." *United States v. Lattany*, 982 F.2d 866, 879 (3rd Cir.1992), *petition for cert. filed*, (Mar. 17, 1993) (No. 92–8187); *see also United States v. Bruckman*, 874 F.2d 57, 62 (1st Cir.1989).

Based on our review of the government's motion and the district court's order, we conclude that the district court's findings comported with the requirements of § 3161(h)(8). On December 18, 1991, the government filed its motion for continuance of trial, stating that it expected the trial to last ten to fifteen days and that counsel for the government was currently scheduled for three conflicting trials: (1) a three to four-day trial beginning January 6, 1992; (2) a five-day trial beginning January 27, 1992; and (3) a three-day trial beginning February 25, 1992. The government stated that, because of these conflicting trials, it would not have adequate time to prepare for the instant trial. The following day, December 19, 1991, the district court granted the government's motion. The court found that a continuance was necessary to allow the government suffi-

---

5. The Act provides:

The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(8)(B).

cient time to prepare and stated in its written order that "the period of delay resulting from the continuance granted pursuant to this Order shall be excludable time as provided in 18 U.S.C. § 3161(h)(8) in that the ends of justice served by the granting of such continuance outweigh the best interest of the public and the defendant in a speedy trial."

We conclude that the court properly excluded from its Speedy Trial Act computation the days covered by the government's continuance. First, the court found specifically that granting the continuance struck the proper balance between the ends of justice and the best interest of the public and the defendants in a speedy trial. Second, the court articulated as the basis for that conclusion its belief that a continuance was necessary to allow the government sufficient time to prepare for trial. Although a more thorough and explicit articulation might have better facilitated our review of the district court's decision, the order did list the reasons supporting the finding. We do not require district judges to address those factors that do not apply.

We note that the district court's ruling in this case stands in stark contrast to the situations in *Saltzman,* where the record contained no "ends of justice" findings, 984 F.2d at 1090, and in *Doran,* where the record contained discussion regarding why the case could not proceed but was devoid of any specific "ends of justice" finding, 882 F.2d at 1515. In this multi-defendant case, the district court, which already had ruled on numerous motions and was aware of the defendants' various substantive arguments, believed that the government needed more than a day or two between trials in order to prepare its case. The district court's determination was both based on facts outlined in the government's motion and supported by substantial evidence in the record. Therefore, excluding the twenty-eight days covered by the continuance, defendants' speedy trial computation amounts to only a fifty-day delay, *see supra* note 3, which is well within the seventy days allowed under the Speedy Trial Act.

██ We also reject the defendants' claims that the delay prior to trial violated their rights under the Sixth Amendment. "A Sixth Amendment speedy trial claim is assessed by balancing the length of the delay, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether the delay prejudiced the defendant." *United States v. Tranakos,* 911 F.2d 1422, 1427 (10th Cir.1990) (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972)). Although none of these factors is itself a necessary or sufficient condition to finding a deprivation of the right to a speedy trial, a "presumptively prejudicial" period of delay is a threshold factor. *See United States v. Kalady,* 941 F.2d 1090, 1095 (10th Cir.1991).

██ As we recently made clear, a defendant's Sixth Amendment rights accrue only upon the filing of a federal charge, not by any prior state arrest or indictment. *See United States v. Allen,* 986 F.2d 1354, 1356 (10th Cir.1993). The federal charges were filed on August 15, 1991. Thus, the February 3, 1992 trial began 172 days later, or approximately five and one-half months later. Given that we have found delays of as much as thirty months nonprejudicial, *see Bagster,* 915 F.2d at 611, that much of the relatively short period of time was consumed by the defendants' various pretrial motions, and that the remaining delay resulted from a continuance. the court deemed necessary for the government's adequate preparation, we conclude that this delay did not cause defendants prejudice to a degree that would violate their Sixth Amendment rights.

B. Officer Robinson's Jurisdiction

██ Officer Robinson was an Undersheriff for Allen County, Kansas. The events underlying this appeal took place in Anderson County, Kansas. The defendants argue that any evidence seized as a result of Robinson's involvement was inadmissible because Robinson had no official authority in Anderson County. *See* Kan.Stat.Ann. § 22–2401a(1) (1988) (limiting official authority of county officers to own county absent request for assistance or fresh pursuit). Toward that end, they cite *State v. Hennessee,* 232 Kan. 807, 658 P.2d 1034 (1983), in which the Kansas Supreme Court affirmed the dismissal of

a complaint where a county sheriff served an arrest warrant outside of his jurisdiction. *Id.* 658 P.2d at 1037.

We reject the defendants' argument. Officer Robinson was accompanied by two KBI agents. Pursuant to Kan.Stat.Ann. 75–712 (1989), KBI agents are vested with the powers and privileges of sheriffs of the state of Kansas. Accordingly, the KBI agents were at least the functional equivalent of Anderson County sheriffs. *See Hennessee,* 658 P.2d at 1037 (McFarland, J., dissenting). It is undisputed that, although Officer Robinson was present at all times, KBI Agent Rodney Page, who clearly had official authority, applied for and executed the search warrant. The defense maintains that, even if Agent Page physically executed the warrant, it was Officer Robinson who initiated the search. However, they do not contend that Agent Page lacked sufficient personal information to obtain the warrant. Thus, to the extent that Officer Robinson may have exercised "official authority" in Anderson County, none of the evidence seized as a result of the search of the residence was predicated on his official conduct. We therefore conclude that the search of defendants' property was undertaken by law enforcement agents properly working in Anderson County.

**C. Search Warrant**

■ Based on his observations from the open fields of the residence and on the arrest of Occhipinti, Agent Page sought a search warrant for the property. The search warrant was issued and described the property as follows:

> On Approx. 140 acres of land: Land, house, outbuildings, any vehicles and persons located on S.W. corner of range 20 East Township 225 South, Section 36 of CO, KS.

Defendants contend that the warrant was insufficient because of several descriptive errors: (1) the residence was located on forty acres, not one-hundred and forty; (2) the township designation was 22 South, not 225 South; and (3) the warrant omitted the county, Anderson County. The government responds that its application for the warrant

made no mention of the acreage of the property but accurately listed 22 South as the township location and designated Anderson as the county, therefore making any descriptive errors typographical in nature.

■ The Fourth Amendment requires that search warrants describe the place to be searched with particularity. U.S. Const. Amend. IV. "The Supreme Court has stated that the practical accuracy rather than technical precision controls the determination of whether a search warrant adequately describes the premises to be searched." *United States v. Dorrough,* 927 F.2d 498, 500 (10th Cir.1991). Therefore, a warrant description is sufficient if it enables the officers to ascertain the place to be searched with reasonable effort. *See United States v. Sturmoski,* 971 F.2d 452, 458 (10th Cir.1992); *Dorrough,* 927 F.2d at 500.

■■ In making our determination, we read together all properly incorporated or referenced components of the warrant, including the attached application and affidavit. *See United States v. Berisford,* 750 F.2d 57, 58 (10th Cir.1984). In this case, the attached application, which also was signed by the judge, contained the correct address and county designation. Moreover, it is undisputed that no "225 South" or "25 South" existed in Anderson County. Thus, a person serving the warrant would have further reason to seek the necessary clarification in the attached documents. Finally, the knowledge of the executing officer can be considered in determining the sufficiency of the description. *See Sturmoski,* 971 F.2d at 458; *see also United States v. Musson,* 650 F.Supp. 525, 538 (D.Colo.1986). Here, Agent Page, who had been to the property and knew its location well, both applied for and executed the warrant. Under these circumstances, we find no descriptive infirmity in the search warrant.

**D. Vehicle Stop**

■ KHP Trooper Heady and Officer Robinson stopped Suttles' vehicle and arrested Suttles and Swab.[6] The defendants ap-

---

**6.** The defendants appear to make in their briefs

yet another challenge to Officer Robinson's juris-

peal the district court's denial of their motion to suppress evidence seized as a result of that search, arguing that the officers lacked probable cause to arrest. The government responds that it had reasonable suspicion to stop the vehicle and that it developed probable cause to arrest based on information adduced during the investigatory stop. We review the question of the officers' suspicion for clear error, but determine the reasonableness of the stop de novo. *See United States v. Walker*, 941 F.2d 1086, 1090 (10th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

We first note that Occhipinti and Spence, who allege no expectation of privacy in the vehicle whatsoever, lack standing to object to its seizure. As to Suttles and Swab, the officers clearly had reasonable suspicion to stop their vehicle. In particular, the officers possessed abundant information to link the car and its occupants to the marijuana operation: the occupants matched the descriptions of persons suspected of residing at the farm, the car had California tags, and the car contained bags of potting soil similar to that used at the farm. In addition, the car slowed down as it drove past the residence, which now was clearly occupied by law enforcement personnel, and headed down a dead-end road. Under the totality of the circumstances, the officers were justified in stopping the vehicle. *See United States v. Barbee*, 968 F.2d 1026, 1028 (10th Cir.1992).

After questioning Suttles and determining that he had used a fictitious name to purchase property that contained a massive marijuana-growing operation, the officers had sufficient information to believe that Suttles had committed a crime. *See United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992). The evidence seized

was therefore incident to a lawful arrest and was properly admitted.

**E. Protective Sweep**

■ After apprehending Mr. Occhipinti in the marijuana fields, the officers elected to take him back to the house rather than through the brush and back to the car. The officers stated that they did so because they feared they may have been detected and because the path to the house was much clearer than the path back to the car. Upon returning to the house, the officers performed a "protective sweep" of the residence in order to ascertain whether any individuals were there who might jeopardize their safety.

■ On appeal, Mr. Occhipinti challenges the denial of his motion to suppress evidence seized pursuant to that sweep. As the government notes, however, no seizure ever occurred. The officers neither removed any objects that appellant seeks to suppress nor used any information gathered during the sweep as the basis for the search warrant of the house. Because the exclusionary rule cannot serve to suppress evidence not seized, Mr. Occhipinti's motion to suppress was unfounded and we need not discuss the propriety of the protective sweep itself. *See United States v. Soria*, 959 F.2d 855, 857 (10th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 236, 121 L.Ed.2d 171 (1992). The district court's denial of the motion to suppress is affirmed.

**F. Co-conspirator Evidence**

■ Ms. Swab challenges on hearsay grounds the admission of notes and memorabilia seized at the residence and the post-arrest statements of codefendants Occhipinti and Spence. Ms. Swab further contends that her lack of opportunity to cross-examine the

---

dictional authority. First, Trooper Heady was present to make the arrest. Second, Officer Robinson first observed the defendants in Mildred, which is in Allen County. Under Kan.Stat.Ann. § 22–2401a(1) (1988), the jurisdictional limitations do not apply when the officer is in fresh pursuit. The statutes define fresh pursuit as "pursuit, without unnecessary delay, of a person who has committed a crime, or who is reasonably suspected of having committed a crime."

*Id.* § 22–2401a(6)(c). We conclude that, based on his observations in Mildred, Officer Robinson reasonably suspected the defendants of being participants in the marijuana-growing operation and followed them continuously and without delay. *See City of Prairie Village v. Eddy*, 14 Kan. App.2d 661, 798 P.2d 66 (1990) (municipal officer observed traffic violation, followed suspect into neighboring city, and issued ticket after suspect pulled into a parking lot).

codefendants who made the post-arrest statements violated her rights under the Confrontation Clause. We review the admission of evidence for an abuse of discretion, according heightened deference when reviewing the trial court's rulings on hearsay objections. *See United States v. Zimmerman*, 943 F.2d 1204, 1211 (10th Cir.1991). We review the Confrontation Clause argument de novo. *See United States v. Ellzey*, 936 F.2d 492, 495 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 400, 116 L.Ed.2d 350 (1991).

■ We apply a three-part test in examining the admissibility of co-conspirator statements under Fed.R.Evid. 801(d)(2)(E). *See United States v. Nicholson*, 983 F.2d 983, 991 (10th Cir.1993). The trial court must find "by a preponderance of the evidence that: 1) a conspiracy existed, 2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy, and 3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). In making these findings, the court may examine both independent evidence and the hearsay statements themselves. *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987); *see also United States v. Brown*, 943 F.2d 1246, 1254 (10th Cir.1991).

Prior to admitting the hearsay statements, the district court concluded that a conspiracy existed among all four defendants. Ms. Swab's longtime presence at the residence had been established. The personal records and notes at issue contained shopping lists, lists of investors, diagrams and blueprint drawings for the cold frames, and notes from Swab to Suttles telling him where (partially-smoked) rolled marijuana cigarettes were located in the house. The district court clearly did not abuse its discretion in determining that these statements were made in furtherance of the conspiracy existing between the defendants.

■ In addition, Swab generally challenges the admission of "the statements the defendants made while being transported to and from the various court appearances while in custody." She fails, however, to identify these statements in her brief. We therefore consider both her hearsay and Confrontation Clause arguments as to these statements waived.

### G. Sentencing Errors

Mr. Spence contends that the trial court erred in calculating his sentence because it (1) increased his offense level based on conduct for which he was acquitted, (2) failed to reduce his offense level based on his status as a minimal participant, and (3) applied an allegedly unconstitutional plant-to-kilogram equivalency formula. We review the district court's factual findings for clear error and its interpretation of the Guidelines de novo. *See United States v. Miller,* 987 F.2d 1462, 1465 (10th Cir.1993).

■ Spence objected to the Presentence Report's inclusion of a two-level increase to his base offense level under U.S.S.G. § 2D1.1(b)(1) for the possession of a firearm. Spence bases his argument on the fact that the jury acquitted him on count three for knowingly using a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). In *United States v. Coleman,* 947 F.2d 1424 (10th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992), however, we held that an acquittal under § 924(c)(1) does not preclude the application of § 2D1.1(b)(1). *Id.* at 1428–29; *see also United States v. Eagan,* 965 F.2d 887, 892 (10th Cir.1992). Considering that the firearm was found in Spence's backpack at the residence and that he possessed a shell matching that weapon at the time of his arrest, we find no error in the district court's decision to increase his offense level under § 2D1.1(b)(1).

■ At sentencing, Spence neither requested an offense level reduction as a "minimal participant" nor challenged the constitutionality of the marijuana plant conversion formula. The defendant's failure to object to the presentence report precludes our review of the merits absent plain error. *See United States v. Saucedo,* 950 F.2d 1508, 1511 (10th Cir.1991). We previously have held, however, that application of the wrong Guidelines

range constitutes plain error. *See United States v. Smith*, 919 F.2d 123, 124 (10th Cir.1990).

 First, Spence clearly does not qualify for an offense level reduction under U.S.S.G. § 3B1.2(a). Spence had the burden of establishing by a preponderance of the evidence that he was a minimal or minor participant, a factual finding which cannot be disturbed absent clear error. *United States v. Carter*, 971 F.2d 597, 599 (10th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 628, 121 L.Ed.2d 560 (1992); *see also United States v. Caruth*, 930 F.2d 811, 812 (10th Cir.1991). Given that the record evidence unmistakably demonstrates Spence's knowledge of and participation in the marijuana farm and that, having failed to argue for the reduction at sentencing, Spence presented no evidence in mitigation of his activity, Spence clearly fails to show by a preponderance of the evidence that he merits any "role-in-the-offense" reduction.

 Second, we reject Spence's challenge to the constitutionality of the sentencing scheme found in U.S.S.G. § 2D1.1(a)(3), (c), which provides that, in cases involving fifty or more marijuana plants, each plant is the equivalent of one kilogram for sentencing purposes. In *United States v. Lee*, 957 F.2d 778 (10th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992), we rejected a challenge to the constitutionality of the minimum sentencing provisions found at 21 U.S.C. § 841(b)(1)(B)(vii), holding that Congress rationally "intended to punish growers of marijuana by the scale or potential of their operation and not just the weight of the plants seized at a given moment." 957 F.2d at 784. We uphold the constitutionality of the Guidelines' equivalency scheme as applied in this case for the same reason. Large-scale marijuana growers simply are not a suspect class deserving of heightened scrutiny, and there is a rational basis for

penalizing large producers at an elevated level, regardless of their actual proficiency in achieving the weight equivalencies upon which they are sentenced.[7]

The convictions and sentences of all four defendants are **AFFIRMED**.

---

7. The case defendant cites, *United States v. Prine*, 909 F.2d 1109, 1113 (8th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1318, 113 L.Ed.2d 251 *and cert. denied*, — U.S. ——, 111 S.Ct. 2263, 114 L.Ed.2d 715 (1991), is inapposite, in that it deals with sentences based on the possession of less than fifty plants, for which the Guidelines' equivalency chart conflicts with § 841(b)(1)(D)'s actual weight analysis. In contrast, § 841(b)(1)(A)(vii) provides for a minimum sentence of ten years for crimes involving 1000 or more plants. Thus, the Guidelines sentence of 135 months did not conflict with the statutory scheme either in defining the sentence or in the sentence itself.