**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 8, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

MARTYE MADABUTI MADKINS III,

　　　　Defendant - Appellant.

No. 15-3299

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 5:13-CR-40060-DDC-6)**

---

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Office of the Kansas Federal Public Defender, Topeka, Kansas, for Appellant.

James A. Brown, Assistant United States Attorney (Thomas E. Beall, United States Attorney, with him on the brief), Office of the United States Attorney, Topeka, Kansas, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **MATHESON** and **MORITZ**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

# I. Introduction

This appeal arose from a law enforcement investigation into a drug-trafficking operation in the Geary County, Kansas area. Agents gathered evidence by making controlled buys of crack cocaine through a confidential informant; monitoring telephones used by certain of the co-conspirators; and conducting searches of several residences. Martye Madkins was arrested and charged with one count of distribution of cocaine base, in violation of 21 U.S.C. § 841(a), and one count of distribution of cocaine base within 1,000 feet of a school, in violation of 21 U.S.C. §§ 841 and 860.

Before trial, Madkins moved to dismiss the indictment for Speedy Trial Act violations. The district court overruled the motion, finding the court had previously granted an ends-of-justice continuance that tolled the speedy-trial clock. Madkins was tried along with several co-defendants, including Johnny Lee Ivory, Anthony Carlyle Thompson, and Albert Dewayne Banks, who are appellants in related appeals.[1] Madkins and his co-defendants were convicted on all counts.

---

[1] We consolidated these four appeals for all procedural purposes, including briefing and oral argument. The government thus submitted one consolidated response brief, and we heard oral argument in Madkins's appeal along with consolidated cases 15-3313 (Thompson) and 15-3324 (Banks). Consolidated case 15-3238 (Ivory) was submitted on the briefs.

Madkins challenges the district court's denial of his motion to dismiss for Speedy Trial Act violations. He also appeals his sentence, arguing the district court erred in applying a career-offender enhancement and in denying his request for a variance. We affirm Madkins's convictions, because the court did not err in denying Madkins's motion to dismiss for Speedy Trial Act violations. The court properly relied on ends-of-justice factors in granting a trial continuance. But we vacate Madkins's sentence and remand for resentencing, because the district court erred in denying Madkins's request for a variance. The court impermissibly relied on a belief that it was obligated to impose a sentence in the guidelines range absent extraordinary circumstances.

## II. Analysis

We address Madkins's challenges to his convictions and sentence in turn.

### A. *Speedy Trial Act Violations*

Madkins first argues the district court violated his right to a speedy trial under the Speedy Trial Act. Specifically, Madkins argues the court erred in a January 6, 2014 order granting a continuance, because it was not a proper ends-of-justice continuance and thus did not toll the speedy-trial clock for the seventy-one days covered by the order. We disagree and conclude the court's ends-of-justice continuance complied with the requirements of the Act.[2]

---

[2] Because this conclusion is dispositive of the Speedy Trial Act issue, we
(continued...)

We review a district court's decision to grant an ends-of-justice continuance for an abuse of discretion. *United States v. Watson*, 766 F.3d 1219, 1228 (10th Cir. 2014). But whether the court complied with the Speedy Trial Act's procedures and applied the appropriate legal standards is an issue of law that we review de novo. *Id.* We review any factual findings for clear error. *Id.*

Before we go into detail about those aspects of the district court's rulings Madkins contends are inadequate, we briefly review the applicable speedy-trial principles.

The Sixth Amendment guarantees an accused's right to a speedy trial in criminal prosecutions. The Speedy Trial Act codifies this right, providing that a defendant's trial "shall commence within seventy days" of the indictment or the defendant's first appearance, "whichever date last occurs." 18 U.S.C. § 3161(c)(1). When a defendant demonstrates a violation of the Act, the proper remedy is dismissal of the indictment. *See* 18 U.S.C. § 3161(a)(2).

The seventy-day time period may be tolled for certain reasons enumerated in the Act, which include when the district court grants an ends-of-justice continuance. That is, the court may grant a continuance of the trial date when the "ends of justice" support doing so. The Act therefore excludes, in relevant part,

> [a]ny period of delay resulting from a continuance granted
> by any judge . . . if the judge granted such continuance on

[2](...continued)
do not reach the parties' remaining arguments.

-4-

the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).

The Act also explains that in granting an ends-of-justice continuance, the court must consider certain factors, including (1) whether the failure to grant the continuance would "result in a miscarriage of justice," 18 U.S.C. § 3161(h)(7)(B)(i); (2) whether due to the nature of the case (or other factors, including the number of defendants) the case is too complex to reasonably expect adequate preparation within the time limits, 18 U.S.C. § 3161(h)(7)(B)(ii); or (3) whether a refusal to continue the case would deny the defendant "reasonable time to obtain counsel" or would unreasonably deny either party "the reasonable time necessary for effective preparation," 18 U.S.C. § 3161(h)(7)(B)(iv). The court may not, however, grant a continuance "because of general congestion of the court's calendar." 18 U.S.C. § 3161(h)(7)(C).

The Supreme Court has interpreted these provisions to mean that "the Act requires express findings," which must be made on the record. *See Zedner v. United States*, 547 U.S. 489, 506–07 (2006). Likewise, we have previously

instructed, "[w]hen considering such a continuance, the trial court must make explicit findings regarding why granting the continuance will strike a proper balance between the ends of justice and the best interest of the public and the defendant in a speedy trial." *United States v. Occhipinti*, 998 F.2d 791, 797 (10th Cir. 1993). But we have further explained, "[i]n setting forth its findings, however, the district court need not articulate facts 'which are obvious and set forth in the motion for the continuance itself.'" *Id.* (quoting *United States v. Lattany*, 982 F.2d 866, 879 (3d Cir. 1992)). And we have clarified that "[i]n determining whether the district court relied on sufficient facts in granting an ends-of-justice continuance, we can look to 'the oral and written statements of both the district court and the moving party.'" *United States v. Loughrin*, 710 F.3d 1111, 1119 (10th Cir. 2013) (quoting *United States v. Toombs*, 574 F.3d 1262, 1271 (10th Cir. 2009)).

In considering whether there are sufficient ends-of-justice findings in the record, we have distinguished between (1) cases where the record "contain[s] an explanation of why the mere occurrence of the event identified by the party as necessitating the continuance results in the need for additional time" and (2) those where the record contains "only short, conclusory statements lacking in detail." *See Toombs*, 574 F.3d at 1271. While findings of the former type are generally adequate to satisfy the requirements of the Speedy Trial Act, the latter are not.

In *Occhipinti*, for example, we held the court's findings comported with the Speedy Trial Act, based on both the court's findings in its written order and the statements of the government, the moving party.  In its motion for a continuance, the government explained it had three upcoming trials scheduled and thus would not be able to prepare for the instant trial without additional time.  998 F.2d at 797.  The district court granted the motion, finding "that a continuance was necessary to allow the government sufficient time to prepare" and stating in its written order that "the period of delay resulting from the continuance granted pursuant to this Order shall be excludable time as provided in 18 U.S.C. § 3161(h)(8) in that the ends of justice served by the granting of such continuance outweigh the best interest of the public and the defendant in a speedy trial." *Id.* at 797–98.

We held that on this record, the court properly excluded the days covered by the continuance from the Speedy Trial Act calculation. *Id.* at 798.  We acknowledged that "a more thorough and explicit articulation might have better facilitated our review of the district court's decision." *Id.*  But we reiterated that the court is not required to address any ends-of-justice factors that do not apply.  We also noted that the case involved multiple defendants, and the court was very familiar with the case, having already ruled on a number of motions. *Id.*  Accordingly, we concluded, "[t]he district court's determination was both based

on facts outlined in the government's motion and supported by substantial evidence in the record." *Id.*

On the other hand, in *Toombs* we reached the opposite conclusion. In that case, the district court granted several ends-of-justice continuances based on the defendant's representations that counsel needed time to review additional discovery. 574 F.3d at 1269–70. We held the court's findings were insufficient to toll the speedy-trial clock, because they consisted of "conclusory statements lacking both detail and support." *Id.* at 1272. In reaching this conclusion, we relied on two of our previous decisions, *United States v. Gonzales*, 137 F.3d 1431 (10th Cir. 1998), and *United States v. Williams*, 511 F.3d 1044 (10th Cir. 2007). In *Gonzales*, the district court granted a continuance because the prosecutor said he was going to be out of town during the days leading up to the court's two suggested trial dates. 137 F.3d at 1434. After reviewing the transcript of the hearing on the continuance, we held the court's ends-of-justice findings were insufficient for several reasons. Not only did the court entirely fail to inquire into the nature and complexity of the case or whether the case could be tried by different government counsel, it also failed to discuss how much time the prosecutor needed to prepare for trial and what preparations had already been made. And the court failed to ask why the prosecutor would be out of town. *Id.* at 1434–35. We also noted that even if the court had properly weighed the ends-of-justice factors, granting the continuance would have been an abuse of

discretion, because the case was a straightforward bank robbery prosecution involving a single defendant. *Id.* at 1435.

Likewise, in *Williams*, we held several of the district court's continuances were not excludable under the Speedy Trial Act, because there was no indication the court considered the relevant ends-of-justice factors. Two of the continuances contained no ends-of-justice findings but rather summarily rescheduled the trial date, citing the Act's ends-of-justice provision. 511 F.3d at 1057. The third continuance presented a "closer question," since the motion for a continuance asked for additional time for defense counsel to familiarize himself with the case. *Id.* We acknowledged the court need not articulate facts which are obvious and set forth in the motion. *Id.* But we still concluded the court's findings were inadequate, because the court did not make any findings on the issue of trial preparation beyond mentioning the presence of new counsel, nor did it even cite the Act's ends-of-justice provision. *Id.* at 1058. In closing, we noted that none of the deficiencies in the three continuance orders could be cured by on-the-record findings—the record was "completely devoid of any ends-of-justice findings, either oral or written, bolstering the findings in the three orders." *Id.*

In *Toombs*, therefore, we distilled the following rule from our discussion of *Gonzales* and *Williams*: "A record consisting of only short, conclusory statements lacking in detail is insufficient" for purposes of the Act. 574 F.3d at 1271. Applying this standard to the continuances in *Toombs*, we held the record did not

contain adequate ends-of-justice findings.  Not only was there no explanation in the record for why the newly disclosed discovery necessitated additional time to prepare for trial, there was no discussion in either the motions or the orders "regarding the nature or importance of the disclosed discovery or the nature of the further investigation allegedly required." *Id.* at 1272.  We also noted that "no hearings took place." *Id.*

After examining the record in this case, we are satisfied that here, as in *Occhipinti*, the record contains sufficient findings supporting the court's ends-of-justice continuance.  By way of background, Madkins was indicted on May 29, 2013 and first appeared in court on June 6, 2013, but his trial did not begin until June 3, 2015.  On January 6, 2014, in response to motions for a continuance filed by several defendants, the district court held a status conference and scheduled trial for October 28, 2014.  The court memorialized its oral ruling in a January 7, 2014 written order.  On January 31, 2014, Madkins's co-defendant Banks filed a demand for a speedy trial, which he renewed at an April 14, 2014 status conference.  In fall 2014, the trial date was again continued, this time to June 2015.  It is the January 2014 continuance Madkins challenges on appeal.

On February 2, 2015, Madkins filed a motion and memorandum seeking release from custody based on violations of the Speedy Trial Act.  The district court denied the motion in a written order filed April 15, 2015, concluding the January 2014 order was a proper ends-of-justice continuance that tolled the

speedy-trial clock. On June 1, 2015, Madkins moved to dismiss the case for Speedy Trial Act violations, adopting by reference the arguments from his motion for release from custody. The court denied the motion and proceeded with the June 3, 2015 trial date. Madkins was convicted on all counts charged.

We start with the district court's January 7, 2014 written Scheduling Order, issued the day after the status conference. In that order, the court explained it granted an ends-of-justice continuance because of "the complex nature of the case . . . and based on counsel's representations at the January 6th hearing about their upcoming trial schedules." R., Vol. I at 350. The court stated it had "determined that the deadlines discussed at the status conference should be adopted," and "any period of delay resulting from the schedule below shall be excludable time as provided for by the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)." *Id.*

We recognize that standing alone, the findings in this order fall rather close to the line we drew in *Toombs*. Taken on its own, the findings in the order resemble the type of short, conclusory statements we have previously rejected as insufficient to satisfy the requirements of the Speedy Trial Act. But we are entitled to look elsewhere in the record—namely, to the oral and written statements of the district court and the moving party. And here, the record contains sufficient ends-of-justice findings to support the issuance of the continuance.

-11-

First of all, in their motions for a continuance, several defendants argued that granting additional time would serve the ends of justice. For example, defendant Zachary Patmon argued counsel needed additional time "to review the discovery," which was "necessary for counsel to confer with defendant about the evidence and the panoply of issues this case may ultimately contain." R., Vol. I at 252. Patmon further explained that he lived several hours away from his attorney and would need to travel to meet with counsel. He asserted that failure to grant additional time would prevent counsel from adequately preparing for trial and argued any delay resulting from the continuance would serve the ends of justice and "outweigh the best interest of the public and the defendant in a speedy trial." *Id.* at 253.

Similarly, in his motion, defendant Walter Banks stated, "additional time is needed for defense counsel to review the voluminous discovery in this case with defendant and for counsel to confer with defendant about the evidence and the various issues this case may ultimately present." *Id.* at 311. Like Patmon, Banks argued the delay was necessary for counsel to prepare for trial effectively and would serve the ends of justice. Defendant Karen Johnson presented similar arguments in her motion for a continuance. Johnson also emphasized that the case was complex, with fourteen defendants and "an extended investigation of numerous persons for over a year" that involved extensive wire and electronic surveillance. *Id.* at 340. In light of the volume of evidence and the number of

defendants, Johnson argued, it would be unreasonable for the court "to expect adequate preparation for pretrial proceedings and for trial within the time limits established by the Speedy Trial Act." *Id.*

Additionally, the transcript of the January 6, 2014 status conference further supports our conclusion that the record contains a sufficient explanation as to why granting a continuance in this case would serve the ends of justice. At the outset, the district court noted the case was complex and involved numerous defendants charged with various drug conspiracy counts, substantive drug counts, and firearms counts. Reinforcing this point, the government advised the court the case involved fourteen defendants, and that discovery amounted to 400 gigabytes of information in electronic format. And counsel for defendant Alfred Banks told the court he was waiting for additional discovery, which he needed to obtain before he could file his pretrial motions. Considering these aspects of the record in conjunction with the court's written order, we conclude the court's continuance was supported by sufficient ends-of-justice findings.

But Madkins also argues the continuance was contrary to the Speedy Trial Act for an additional reason: he believes the district court impermissibly relied on its own congested calendar in granting the continuance. We disagree. Although there was some discussion of the court's calendar at the status conference—the court noted it had a large drug-conspiracy trial set for early September—we do not believe the court granted the continuance *because of* its congested schedule.

-13-

Rather, the court expressly considered the nature and complexity of the case, as well as the need for additional time to allow defense counsel adequate time for effective preparation. Indeed, the court acknowledged that counsel for some of the defendants had an upcoming seven-week trial requiring their time and attention. Therefore, although the court briefly mentioned its calendar, it did not rely on this factor alone in granting defendants' requests for a continuance.

In sum, we affirm the district court's denial of Madkins's motion to dismiss, because the January 6, 2014 order was a proper ends-of-justice continuance that tolled the speedy-trial clock for the days covered by the continuance. Accordingly, there was no Speedy Trial Act violation.

### B. *Career-Offender Designation*

Madkins next argues the district court erred in concluding that his two prior Kansas convictions for possession with intent to sell cocaine and marijuana are controlled substance offenses within the meaning of the Sentencing Guidelines. Based on this conclusion, the court designated Madkins as a career offender, which significantly increased his total offense level and corresponding guidelines sentencing range. Madkins thus asks us to vacate his sentence and remand for resentencing without the career-offender enhancement.

We review challenges to the imposition of guidelines enhancements for clear error as to findings of fact and de novo as to questions of law. *United States v. Irvin*, 682 F.3d 1254, 1276–77 (10th Cir. 2012). Whether a prior conviction

qualifies as a predicate offense for career-offender purposes is a question of law

that we review de novo. *See United States v. Karam*, 496 F.3d 1157, 1166 (10th

Cir. 2007).

Section 4B1.1 of the Guidelines enhances the offense levels for defendants

classified as career offenders.[3]  The enhancement applies to a defendant convicted

of a "controlled substance offense" who "has at least two prior felony convictions

of either a crime of violence or a controlled substance offense."  USSG

§ 4B1.1(a).  The Guidelines define a controlled substance offense for purposes of

the career-offender designation as

> an offense under federal or state law, punishable by
> imprisonment for a term exceeding one year, that prohibits
> the manufacture, import, export, distribution, or dispensing
> of a controlled substance (or a counterfeit substance) or
> the possession of a controlled substance (or a counterfeit
> substance) with intent to manufacture, import, export,
> distribute, or dispense.

USSG § 4B1.2(b).  Federal law provides that for purposes of this definition,

"distribute" means "to deliver . . . a controlled substance or listed chemical."

21 U.S.C. § 802(11); *see also United States v. Cherry*, 433 F.3d 698, 702 (10th

Cir. 2005).  The commentary to § 4B1.2 clarifies that a controlled substance

offense includes "the offenses of aiding and abetting, conspiring, and attempting

to commit such offenses."  *See* USSG § 4B1.2 cmt. n.1.

---

[3]  Because the PSR used the 2014 version of the Sentencing Guidelines to
determine Madkins's total offense level, we cite to that version here.

Before Madkins was sentenced, the presentence investigation report (PSR) designated him as a career offender based on his two prior Kansas state convictions for possession with intent to sell cocaine and marijuana. This designation raised Madkins's total offense level from 14 to 34, and his sentencing range from 37–46 months to 262–327 months. Madkins objected to the career-offender designation. He argued his offenses of conviction criminalize a broader swath of conduct than that described in § 4B1.2(b). Specifically, Madkins claimed that his Kansas statutes of conviction criminalized possession of a controlled substance with intent to merely *offer* for sale, whereas the Guidelines definition only extends to offenses prohibiting possession with intent to *distribute*—i.e., to actually sell or deliver a controlled substance. Therefore, Madkins contended that neither conviction was a predicate offense for purposes of the career-offender enhancement.

The district court rejected Madkins's argument. Applying the modified categorical approach, the court determined Madkins was charged with and convicted of possession with the intent to sell—not intent to merely offer. And because the court concluded the elements of Madkins's prior convictions for possession with the intent to sell aligned with the elements in USSG § 4B1.2(b), the court applied the career-offender enhancement and sentenced Madkins accordingly. On appeal, Madkins argues the district court erred, because

-16-

Kansas's broad definition of "sale" takes his offenses of conviction outside the purview of the guidelines definition of a controlled substance offense.

In determining whether a prior conviction qualifies as a predicate offense for a career-offender enhancement, we apply the categorical or modified categorical approach.[4] *United States v. Madrid*, 805 F.3d 1204, 1207 (10th Cir. 2015), *abrogated in part by Beckles v. United States*, 137 S. Ct. 886 (2017). Under the categorical approach, we "line[] up" the elements of the prior conviction alongside the elements of the predicate offense and see if there is a match. *Mathis*, 136 S. Ct. at 2248. But if the prior-conviction statute is divisible—that is, "effectively creates several different crimes"—we use the modified categorical approach to identify the crime of conviction in the particular

---

[4] The government argues Madkins's prior convictions qualify as controlled substance offenses, because his *conduct* could have been charged as a controlled substance offense. In support of this argument, the government cites to our decision in *United States v. Smith*, 433 F.3d 714 (10th Cir. 2006), where we looked to the interpretive notes in the Guidelines and held that § 4B1.2(b) encompasses "convictions for conduct that could have been charged as a controlled substance offense," even if the actual charged offense would not necessarily satisfy the definition. *Id.* at 717.

But since *Smith* was decided, two intervening Supreme Court cases have made it clear that we apply the categorical or modified categorical approach in the context of sentencing enhancements—in other words, we focus on the *elements* of a crime in the abstract, not its underlying facts. *See Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016); *Descamps v. United States*, 133 S. Ct. 2276, 2285 (2013). We therefore decline to follow the conduct-based approach described in *Smith*. *See United States v. White*, 782 F.3d 1118, 1126 (10th Cir. 2015).

-17-

case. *Madrid*, 805 F.3d at 1207. We then compare that crime's elements to the elements of the generic predicate offense. *Id.*

Here, we apply the modified categorical approach, because Madkins's prior-conviction statutes are divisible. Madkins sustained his prior cocaine and marijuana convictions under the Kansas Uniform Controlled Substances Act. The Act prohibited possession with intent to sell cocaine as follows:

> [I]t shall be unlawful for any person to sell, offer for sale or have in such person's possession with intent to sell, deliver, or distribute; prescribe; administer; deliver; distribute; dispense or compound any opiates, opium or narcotic drugs, or any stimulant.

K.S.A. 65-4161(a) (2001 version). Likewise, the Act prohibited possession with intent to sell marijuana:

> [I]t shall be unlawful for any person to sell, offer for sale or have in such person's possession with intent to sell, deliver, or distribute; cultivate; prescribe; administer; deliver; distribute; dispense or compound . . . any hallucinogenic drug.

K.S.A. 65-4163(a)(3) (2001 version). In 2001, Madkins pleaded guilty to possession with intent to sell cocaine, in violation of K.S.A. 65-4161(a); and possession with intent to sell marijuana, in violation of K.S.A. 65-4163(a)(3).

Up to this point, then, we are in agreement with the district court: Madkins was convicted of possession with intent to sell cocaine and marijuana. But unlike the district court, we conclude the elements of Madkins's prior offenses of conviction do not categorically match the elements in § 4B1.2(b), because Kansas

-18-

law defines "sale" to include an "offer to sell." And since an offer to sell is broader than distribution as defined in the Guidelines, Madkins's prior offenses are not controlled substance offenses for purposes of the career-offender enhancement.

We have not previously considered this precise issue, but several cases from other circuits support our analysis. In *United States v. Hinkle*, 832 F.3d 569 (5th Cir. 2016), for example, the Fifth Circuit held a prior Texas conviction for delivering heroin did not qualify as a controlled substance offense for purposes of the career-offender enhancement, because Texas law criminalized an offer to sell a controlled substance. *Id.* at 576–77. Hinkle's statute of conviction penalized a person who "knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance." *Id.* at 572. But a separate section of the statute defined "deliver" to include "offering to sell a controlled substance, counterfeit substance, or drug paraphernalia." *Id.* Accordingly, the Fifth Circuit held, "the 'delivery' element of Hinkle's crime of conviction criminalizes a 'greater swath of conduct than the elements of the relevant [Guidelines] offense.' This 'mismatch of elements' means that Hinkle's conviction for the knowing delivery of heroin is not a controlled substance offense under the Guidelines." *Id.* at 576 (quoting *Mathis*, 136 S. Ct. at 2251).

Similarly, in *United States v. Savage*, 542 F.3d 959 (2d Cir. 2008), the Second Circuit vacated and remanded the defendant's sentence where the

-19-

defendant had pleaded guilty to a drug sale under a Connecticut statute penalizing "[a]ny person who manufactures, distributes, sells . . . [or] possesses with intent to sell . . . any controlled substance." *Id.* at 961. A separate provision of the statute defined "sale" to include "any form of delivery[,] which includes barter, exchange or gift, or offer therefor." *Id.* The Second Circuit first applied the categorical approach and held, "the Connecticut statute, by criminalizing a mere offer to sell, criminalizes more conduct than falls within the federal definition of a controlled substance offense." *Id.* at 966. Then the court applied the modified categorical approach, concluding that the defendant had "pleaded guilty to a 'sale' of a controlled substance." *Id.* at 967. And because "a sale under Connecticut law includes a mere offer to sell drugs," the court held, "and an offer to sell drugs is not a controlled substance offense, the conviction does not qualify as a controlled substance offense." *Id.*

The same reasoning applies here, because a conviction for possession with intent to sell cocaine or marijuana under Kansas law could be based on possession with intent to offer one of those substances for sale. From the outset, we note that unlike in *Hinkle* and *Savage*, the Kansas Uniform Controlled Substances Act did not include a statutory definition of sale at the time Madkins pleaded guilty to both offenses.[5] But other sources of Kansas law make clear that the definition of

---

[5] The Uniform Controlled Substances Act was never amended to include a statutory definition of the sale. But in 2009, the legislature recodified the Kansas

(continued...)

-20-

sale for purposes of the Act encompasses "offers" to sell. In 2001, the controlling

Kansas pattern jury instruction defined "sale" to include an offer to sell. The

instruction explained, in relevant part, that "sale" under the Kansas Uniform

Controlled Substances Act has a broader meaning than it usually does: "Sale

under the Act means selling for money, and also includes barter, exchange, or

gift, or an *offer* to do any of these things." PIK 3d 67.13-A (emphasis added).

This pattern instruction reflects the holdings of two Kansas Supreme Court cases.

*See State v. Evans*, 519 Kan. 515, 518 (Kan. 1976); *State v. Nix*, 215 Kan. 880,

882 (Kan. 1974).

Kansas courts have applied this broad definition of sale in the context of

Madkins's offenses of conviction. In *State v. Donaldson*, 279 Kan. 694 (Kan.

2005), for example, the Kansas Supreme Court held the evidence was sufficient to

sustain Donaldson's conviction for sale of cocaine, in violation of K.S.A. 65-

4161(a). *Id.* at 715–16. The jury instruction on sale mirrored the definition from

*Evans* and *Nix*, and the court noted that "[u]nder this broad definition of sale,

each such transaction need not necessarily include an actual, constructive, or

attempted transfer of a controlled substance." *Id.* at 715 (quoting *State v. Griffin*,

_____

[5](...continued)
criminal code, which now makes it unlawful to "distribute" or to "possess with
the intent to distribute" controlled substances. *See* K.S.A. 21-5705(a). The
statute now provides, "'[d]istribute' includes, but is not limited to, sale, offer for
sale or any act that causes some item to be transferred from one person to
another." K.S.A. 21-5701(d).

221 Kan. 83, 85 (Kan. 1976)).  Accordingly, given the abundance of evidence showing an offer for sale by Donaldson, the court held the jury could have reasonably found Donaldson guilty of sale of cocaine or possession of cocaine with intent to sell.  *Id.* at 716.

Similarly, in *State v. Wilson*, No. 103,749, 2012 WL 718916 (Kan. Ct. App. Mar. 2, 2012) (unpublished), the Kansas Court of Appeals upheld the defendant's convictions for sale of cocaine, in violation of K.S.A. 65-4161(a), in part because the evidence showed the defendant had at least made an *offer* to sell cocaine.  *Id.* at *6–7.  The jury had been instructed on the broad definition of sale under the Uniform Controlled Substances Act.  *Id.* at *6.  The court noted that "[t]hese instructions provided an accurate recitation of the law pertaining to the sale of controlled substances," citing the Kansas Supreme Court's decision in *Donaldson*. *Id.*; *see also State v. Diaz*, No. 100,735, 2010 WL 481258, at *6 (Kan. Ct. App. Feb. 5, 2010) (unpublished) (applying same definition of sale in upholding district court's decision to allow amendment of the complaint before trial).

The government relies on a different Kansas Court of Appeals case, *State v. Waldrup*, 46 Kan. App. 2d 656 (Kan. Ct. App. 2011), to argue that the definition of sale has not been "judicially expanded to include an offer to sell by the Kansas appellate courts' approval of a jury instruction" broadly defining that term.  Aple. Br. at 79.  But the government misreads *Waldrup*.  There the Court of Appeals held that the jury instruction defining sale for purposes of the Uniform Controlled

-22-

Substances Act did not create alternative *means* of committing the crime of sale

of cocaine—only the statute itself contained those alternative elements, and the

defendant had been charged with *sale* of cocaine in particular.[6] 46 Kan. App. 2d

at 662–63. The court agreed, however, that the jury instruction had been

approved by Kansas case law and characterized the definition of sale "as an

explanatory definition rather than a fundamental definition of the crime itself."

*Id.* at 668–69. Thus, *Waldrup* actually supports our conclusion: by defining sale

to include a mere offer to sell, Kansas law criminalizes a broader swath of

conduct than that covered in § 4B1.2(b) of the Guidelines.

In reaching our holding today, we note that at first glance, it seems as

though an offer for sale would fit squarely within the definition in the Guidelines,

since the commentary to § 4B1.2 clarifies that a controlled substance offense

includes an attempt to commit such an offense. But a closer look reveals that the

two are not a categorical match. We have previously explained that in our circuit,

"an attempt to commit a crime requires the *intent* to commit the crime and *overt*

*acts* in furtherance of that intent." *See United States v. Taylor*, 413 F.3d 1146,

1155 (10th Cir. 2005) (emphasis added). And because a person can offer a

controlled substance for sale without having the intent to actually complete the

_____

⁶ Waldrup appears to use the word "means" in a way that is more in keeping with "elements" as defined by the Supreme Court in *Mathis v. United States*, 136 S. Ct. 2243 (2016). That is, "'[e]lements' are the 'constituent parts' of a crime's legal definition—the things the prosecution must prove to sustain a conviction." *Id.* at 2248 (quoting *Black's Law Dictionary* 634 (10th ed. 2014)).

sale, a conviction for an offer to sell can be broader than a conviction for an attempt to sell.

For example, as several other circuits have noted, "[a]n offer to sell can be fraudulent, such as when one offers to sell the Brooklyn Bridge. In such a circumstance, the offer to sell is fraudulent in the sense that the person offering the bridge or the drug does not have the *intent* to distribute or sell the item." *Savage*, 542 F.3d at 965 (citing *United States v. Palacios-Quinonez*, 431 F.3d 471, 476 (5th Cir. 2005)).[7] To be sure, courts have relied on this reasoning in distinguishing between a conviction for possession of a controlled substance with intent to sell or deliver, and a conviction for sale or delivery of a controlled substance without the possession element. But the argument applies with equal force in the context of the distinction between an offer and an attempt.

Since the former does not necessarily involve the intent to sell or distribute that is required for the latter, a conviction for possession with intent to sell a controlled substance—where sale is defined to include an offer—is broader than the conduct criminalized in § 4B1.2(a) and the authoritative commentary.

\* \* \*

---

[7] It is not difficult to imagine a scenario where a person possesses drugs and offers to sell them without ever intending to complete the transaction. For example, the would-be seller might extend an offer to sell marijuana to a would-be buyer. But the seller never intends to hand over the marijuana—instead, he plans to rob the would-be buyer and abscond with the money. In that situation, the offer would be fraudulent, because the offeror never intended to sell.

In sum, we hold the district court erred in applying the career-offender enhancement, because neither of Madkins's prior drug convictions qualify as controlled substance offenses for purposes of the enhancement. Accordingly, we vacate Madkins's sentence and remand for resentencing.

## C. Denial of Request for a Variance

Finally, Madkins contends the district court procedurally erred in denying his request for a downward variance, because the court relied on a belief that it must deny a variance absent extraordinary circumstances. In other words, Madkins argues the court impermissibly treated the Guidelines as mandatory.

At sentencing, Madkins argued that even if the career-offender enhancement did apply, the court should vary downwards, because a sentence of 262 months' imprisonment—at the bottom of Madkins's guideline range with the enhancement—was greater than necessary to achieve the various purposes of sentencing described in 18 U.S.C. § 3553(a). Madkins also argued the court owed less deference to the career-offender enhancement, because that guideline is simply "a one-size-fits-all legislative fiat" that does not reflect empirical evidence or national experience. R., Vol. V at 10.

The court denied Madkins's request for a variance, explaining that it viewed the career-offender enhancement differently than Madkins did. The court stated it viewed the enhancement as a directive from Congress, meaning that "absent extraordinary circumstances the direction [Congress] gave to the

Sentencing Commission should be honored, and that's the reason for the sentence." R., Vol. VII at 4048–49. Earlier, the court had also referred to its tentative sentence of 262 months as the sentence it was "required" to impose, before stopping itself and characterizing the sentence as the one it was going to impose. *Id.* at 4035. Madkins argues this reliance on an extraordinary circumstances rule requires vacatur of his sentence.

We need not reach the merits of this argument, since we have already vacated Madkins's sentence and remanded for resentencing. But on remand, we remind the district court of the teaching of *Gall v. United States*, 552 U.S. 38 (2007), in which the Supreme Court expressly rejected "an appellate rule that requires 'extraordinary circumstances' to justify a sentence outside the Guidelines range." *Id.* at 47.

## III. Conclusion

For the foregoing reasons, we AFFIRM Madkins's convictions but VACATE his sentence and REMAND for resentencing in accordance with this opinion.