**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 7, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

OSCAR ALMANZA-VIGIL,

    Defendant - Appellant.

No. 17-2007

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:15-CR-02605-RB-1)**
_____

James N. Langell, Assistant Federal Public Defender (Stephen P. McCue, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Las Cruces, New Mexico, for Appellant.

Marisa A. Ong, Assistant United States Attorney (James D. Tierney, Acting United States Attorney, with her on the brief), Office of the United States Attorney, Las Cruces, New Mexico, for Appellee.

_____

Before **PHILLIPS**, **KELLY**, and **MURPHY**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

The Immigration and Naturalization Act (INA) defines "aggravated felony" to include "illicit trafficking in a controlled substance," 8 U.S.C. § 1101(a)(43)(B), making removal from this country "a virtual certainty" for a noncitizen convicted of

such a crime, *Sessions v. Dimaya*, 138 S. Ct. 1204, 1211 (2017). The INA imposes serious consequences on a noncitizen convicted of an aggravated felony: (1) he becomes deportable, 8 U.S.C. § 1227(a)(2)(A)(iii); (2) he loses the ability to obtain discretionary relief, like cancellation of removal, *id.* § 1229b(a)(3), or voluntary departure, *id.* § 1229c(a)(1); and (3) he is subject to expedited removal proceedings, with no immigration judge present, *id.* § 1228(a)(1).

That helps explain the stakes for Oscar Almanza-Vigil. In 2007, he pleaded guilty in Colorado state court to "selling or distributing" methamphetamine in violation of Colorado Revised Statutes § 18-18-405(1)(a) (2006), for which he received a four-year prison sentence. In 2009, when the state paroled him, Immigration and Customs Enforcement (ICE) initiated expedited removal proceedings against him, declaring that he had committed an aggravated felony. With that designation, he had no right to an administrative hearing before an immigration judge. *Compare* 8 U.S.C. § 1229a ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."), *with* 8 U.S.C. § 1228(b)(1), *and* 8 C.F.R. § 238.1(b)(2)(i) (allowing the government to put aggravated felons in expedited removal proceedings without a hearing before an immigration judge). Within the week, the Department of Homeland Security had issued a final administrative removal order, and ICE agents had sent Almanza-Vigil back across the border to Mexico. Six years later, border-patrol agents found Almanza-Vigil in the New Mexico desert. Then, charged with illegal reentry, Almanza-Vigil moved to dismiss the indictment by collaterally attacking his previous

2

removal order and arguing, for the first time, that he never committed an aggravated felony.

Now reviewing the district court's judgment convicting Almanza-Vigil for illegal reentry, we must return to 2009, when he left state prison, and ask how he could have avoided removal. To prevail here, Almanza-Vigil must show not only that his Colorado felony was not an aggravated felony, but that misclassifying it as one prejudiced him. To show the required prejudice, he must show that the misclassification rendered the entry of the 2009 removal order fundamentally unfair. Absent that, his appeal fails. *See* 8 U.S.C. § 1326(d).

For the reasons detailed below, we conclude that Almanza-Vigil's Colorado felony does not fit the INA's definition of an aggravated felony. But we also conclude that he failed to demonstrate a reasonable likelihood of avoiding removal but for the erroneous classification of his conviction. The INA therefore parries a collateral attack on Almanza-Vigil's previous removal order. 8 U.S.C. § 1326(d). So, exercising our jurisdiction to review the district court's final orders, 28 U.S.C. § 1291, we affirm that court's judgment of conviction.[1]

---

[1] The INA curbs our jurisdiction to review the removal order itself. Though the Act grants federal appellate courts exclusive authority to review final orders of removal, it also carves from that authority our jurisdiction to review "any final order of removal entered against an alien who is removable by reason of having committed a criminal offense" covered by the statute, including an aggravated felony. 8 U.S.C. § 1252(a)(1), (a)(2)(C). Irrespective of statutory bars on our jurisdiction, however, we retain the "authority to determine whether the factual conditions for the bar are present." *Shepherd v. Holder*, 678 F.3d 1171, 1180 (10th Cir. 2012). Moreover, notwithstanding 8 U.S.C. § 1252(a)(2)(C)'s ban on reviewing orders to remove

Born in Chihuahua in 1984, Almanza-Vigil is a Mexican citizen. In 1993, eight-year-old Almanza-Vigil and his family trekked across the Mexico–United States border, without documents and without government inspection, and settled in Colorado. Almanza-Vigil never acquired legal immigration status, but he grew up in this country, learning English, graduating from high school, finding work at a dairy farm, and eventually fathering a son.

In 2006, when Almanza-Vigil was twenty-one years old, the district attorney in Fort Morgan, Colorado, charged him with six violations of the state's controlled-substances act, all felonies. Counts 1, 2, and 3 of the criminal complaint charge three, identical crimes: that "[o]n or [a]bout" September 15, 20, and 27 of that year, Almanza-Vigil "unlawfully, feloniously, and knowingly sold or distributed METHAMPHETAMINE, a schedule II controlled substance, in violation of section 18-18-405(1),(2)(a)(I)(A), [Colorado Revised Statutes]." Suppl. R. vol. 2 at 3 (bolding removed). Likewise, counts 4, 5, and 6 charge him with possessing methamphetamine "[o]n or [a]bout" the same dates. *Id.* vol. 2 at 3–4.

At the time, Colorado Revised Statutes § 18-18-405 provided, in pertinent part:

_____

"criminal aliens"—or any other statutory (or non-statutory) limit on our jurisdiction—the INA preserves our jurisdiction to review constitutional and legal issues. *See* 8 U.S.C. § 1252(a)(2)(D). So, even within the INA's (restrictive) judicial-review scheme, 8 U.S.C. § 1252 leaves us the authority to decide whether Almanza-Vigil committed an aggravated felony.

(1)(a) Except as authorized by [other provisions of state law], it is unlawful for any person knowingly to manufacture, dispense, sell, distribute, possess, or to possess with intent to manufacture, dispense, sell, or distribute a controlled substance; or induce, attempt to induce, or conspire with one or more other persons, to manufacture, dispense, sell, distribute, possess, or possess with intent to manufacture, dispense, sell, or distribute a controlled substance; or possess one or more chemicals or supplies or equipment with intent to manufacture a controlled substance.

. . . .

(2)(a) Except as is otherwise provided in subsection (2.3) of this section for possession offenses not including possession with the intent to distribute involving one gram or less of any material, compound, mixture, or preparation that contains any quantity of a schedule I through IV controlled substance, . . . any person who violates any of the provisions of subsection (1) of this section:

(I) In the case of a controlled substance listed in schedule I or II of part 2 of this article, commits:

(A) A class 3 felony; except that a person commits a class 4 felony if such violation is based on the possession of a controlled substance listed in schedule II unless otherwise provided in paragraph (a) of subsection (3) of this section[.]

. . . .

(2.3)(a) Any person who commits the offense of possession in violation of the provisions of subsection (1) of this section by possessing any material, compound, mixture, or preparation, weighing one gram or less that contains any quantity of a controlled substance listed in schedules I through IV of part 2 of this article commits:

(I) A class 6 felony[.]

Colo. Rev. Stat. § 18-18-405 (2006).[2]

---

[2] Since 2006, the Colorado legislature has revised § 18-18-405 several times. *See, e.g.*, H.B. 10-1352, 67th Gen. Assemb., 2d Reg. Sess, ch. 259, 2010 Colo. Sess. Laws 1162, 1164 (striking simple possession from § 18-18-405(1)(a)'s list of proscriptions).

In August 2007, Almanza-Vigil pleaded guilty to count 1, "selling or distributing" methamphetamine. In exchange, the state dismissed the remaining five charges. The state court's "sentence order" reflects this bargain. Suppl. R. vol. 2 at 5. The order shows Almanza-Vigil's "Plea of Guilty" to count 1, "18-18-405(1), (2)(a)(I)(A) – Controlled subst-Distribute s," a class 3 felony, and lists counts 2, 3, 4, 5, and 6—two more distribution charges (also class 3 felonies) and three possession charges (two class 4 felonies and one class 6 felony)—as "Dism by DA." Suppl. R. vol. 2 at 5. The court sentenced Almanza-Vigil to serve four years in state prison.

Two years passed. Then, prison officials informed Almanza-Vigil (whose parole was approaching) that the federal government had issued an immigration hold. "[Y]ou're going to be going to Mexico," he remembers being told. R. vol. 1 at 154:25. And from that point on, he claims, he "never thought" that he would be able to challenge his removal. R. vol. 1 at 155:1.

In April 2009, the state released Almanza-Vigil to ICE agents, who detained him pending his removal. The Department of Homeland Security had decided that Almanza-Vigil's Colorado conviction met 8 U.S.C. § 1101(a)(43)(B)'s definition of an "aggravated felony," making him deportable under 8 U.S.C. § 1227(a)(2)(A)(iii) and, because he lacked permanent-resident status, subjecting him to expedited

6

removal proceedings under 8 U.S.C. § 1228(b) and 8 C.F.R. § 238.1(b), (d), without a hearing before an immigration judge.[3]

The record on appeal contains the two forms that the government claims to have given Almanza-Vigil during these proceedings: a two-page Notice of Intent (exhibit 4) and a one-page Certificate of Service (exhibit 5). These forms are, in the district court's words, "a mess." R. vol. 1 at 354 ¶ 10.

Exhibit 4 is titled, "Notice of Intent to Issue a Final Administrative Removal Order." Suppl. R. vol. 2 at 6. Below that title, the Notice is addressed to "Oscar ALAMANZA-VIGIL" (a misspelling repeated on the next page). *Id.* at 6, 7. The Notice then sets forth the "Charge": "You are deportable under . . . 8 U.S.C. § 1227(a)(2)(A)(iii), as amended, because you have been convicted of an aggravated felony . . . ." Suppl. R. vol. 2 at 6. And it explains "Your Rights and

_____

[3] In expedited removal proceedings, a noncitizen with an aggravated-felony conviction is "conclusively presumed to be deportable," 8 U.S.C. § 1228(c), and ineligible for discretionary relief from removal, *id.* § 1228(b)(5). Still, the expedited-removal statute and its accompanying regulations protect noncitizens' rights to procedural due process. *See id.* § 1228(b)(4). Section 1228(b)(3) requires the government to wait fourteen days after issuing the final removal order and before executing it to allow the noncitizen "an opportunity to apply for judicial review" of the order—unless the noncitizen waives this waiting period. Under § 1228(b)(3), the government also must give the noncitizen reasonable notice of the charges against him, as well as an opportunity to rebut them, and allow the noncitizen "the privilege of being represented (at no expense to the government)" by counsel. *Id.* § 1228(b)(4)(A)–(C). Agency regulations add more specific mandates: A noncitizen must be served with "Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order," which must inform the noncitizen of his rights to representation and to judicial review, among other rights, and provide him with a list of free legal services. 8 C.F.R. § 238.1(b)(1)–(2).

Responsibilities," including (1) that "you may contact legal counsel from the list of available services provided to you" (a list that the government didn't provide) and (2) that if you want to exercise your rights to rebut the charge or to seek judicial review, the government must receive your written response within ten days. *Id.* But the Notice lacks a designated space for Almanza-Vigil's signature. And while the Notice's first page claims to be "Form I-851," the next page identifies itself as "Form I-831 Continuation Page" and purports to be the third of three pages. *Id.* at 7. Above this puzzling footer, the Continuation Page contains a typewritten paragraph alleging, "You were[] . . . convicted . . . for the offense of, Controlled Substance-Distribute Sch. 2; to wit: Methamphetamine in violation of C.R.S. 18-18-405(1), (2)(a)(I)(A) for which the term of imprisonment was 4 years." *Id.*

Exhibit 5, the Certificate of Service, begins with an ICE agent's signed statement: "I served this Notice of Intent. I have determined that the person served with this document is the individual named on the other side of the form." *Id.* at 8. (The contents of the "other side" remain a mystery: the district court deduced only that "the other side" was probably *not* the Certificate, based on the government's introduction of the Notice and the Certificate as separate exhibits.) Beneath two checked boxes—one admitting "the allegations and charge in this Notice of Intent," another waiving "the right to remain in the United States . . . to apply for judicial review"—the Certificate has three lines: on the first is a hand-drawn "x" and Almanza-Vigil's signature; on the second, someone printed "Oscar Almanza"; and on the third is the date, April 6, 2009. *Id.*

8

In the government's view, Almanza-Vigil knowingly waived his right to contest his removal by signing the Certificate. So, on April 6 (the same day that he signed it), the Department of Homeland Security issued a final administrative removal order declaring (1) that Almanza-Vigil is not a U.S. citizen, (2) that he has never been lawfully admitted for permanent residence to the United States, and (3) that he has been convicted of an aggravated felony defined in 8 U.S.C. § 1101(a)(43)(B). ICE executed the order a week later, on April 13, and an immigration official witnessed Almanza-Vigil walk across the border near El Paso, Texas, and into Mexico.

Six years later, in April 2015, a set of footprints in the New Mexico desert led border-patrol agents to Almanza-Vigil, who was hiding in a mesquite bush near the border fence. The agents arrested him, suspecting that he'd entered illegally. After his processing revealed the 2009 removal order, prosecutors filed a criminal complaint in the U.S. District Court for the District of New Mexico, alleging that Almanza-Vigil had reentered the country in violation of an outstanding removal order that had followed an aggravated-felony conviction. Three months later, a grand jury returned an indictment charging him with illegal reentry in violation of 8 U.S.C. § 1326(a) and (b).

Almanza-Vigil moved to dismiss the indictment by attacking his 2009 removal order—the government's proof that he had reentered illegally (a felony under 8 U.S.C. § 1326) rather than merely entered improperly (a misdemeanor under § 1325). The 2009 removal order was "improperly issued," he claimed, because he

9

had never been convicted of an aggravated felony. R. vol. 1 at 54. Had the government realized this, he argued, he would not have been put in expedited removal proceedings, and he could have applied for (and likely received) discretionary relief from removal. But the district court denied the motion and foreclosed Almanza-Vigil's collateral attack. Twice, Almanza-Vigil asked the court to reconsider this ruling, but twice, the court refused.

On December 14, 2015, after denying Almanza-Vigil's first motion to reconsider, the court held a bench trial. "[B]ased upon the undisputed testimony" that he had returned to the United States without permission after being deported, the court found Almanza-Vigil guilty of violating 8 U.S.C. § 1326(a) and (b). Four weeks later, after denying his second motion to reconsider, the court entered judgment and sentenced Almanza-Vigil to 635 days in prison (approximately time served—he had been in custody since his arrest on April 19, 2015).[4] He immediately appealed.

## DISCUSSION

Almanza-Vigil challenges the district court's refusal to dismiss the illegal-reentry indictment. On appeal, as in the district court, he disputes the validity of his 2009 removal order by arguing that it was entered without due process. When a noncitizen attacks the constitutionality of a previous removal proceeding in this way, he presents a mixed question of law and fact that we review de novo. *United States v.*

---

[4] After his release, he returned to Mexico.

10

*Aguirre-Tello*, 353 F.3d 1199, 1204 (10th Cir. 2004). But before addressing the merits of Almanza-Vigil's appeal, we must narrow the question. To do so, we weave together the appeal's statutory and procedural context.

### A. How Can a Noncitizen Prosecuted for Illegal Reentry Collaterally Attack the Underlying Removal Order?

When the government prosecutes a noncitizen for illegal reentry, it typically must prove two things: (1) that the noncitizen left the United States with an outstanding order of removal against him and (2) that afterward, the noncitizen entered, tried to enter, or was found in the United States. 8 U.S.C. § 1326(a).

When the government offers a previous removal order as evidence of the first element, the Fifth Amendment protects the noncitizen's right to challenge that order, even years after the time for appeal has passed and the order has become final. *United States v. Mendoza-Lopez*, 481 U.S. 828, 837–39 (1987); *accord United States v. Adame-Orozco*, 607 F.3d 647, 651 (10th Cir. 2010). Congress codified this right in 8 U.S.C. § 1326(d), subject to a noncitizen's meeting three conditions. *See Adame-Orozco*, 607 F.3d at 651. To collaterally attack a previous removal order, the noncitizen must show (1) that he exhausted all administrative remedies available to contest the previous removal order, (2) that the previous removal proceedings deprived him of the opportunity to seek judicial review, and (3) that the previous order's entry was fundamentally unfair. 8 U.S.C. § 1326(d).

Here, the district court concluded that, although Almanza-Vigil could satisfy the first two conditions (administrative exhaustion and denial of judicial review) he

11

could not demonstrate the third condition, that the entry of the 2009 removal order was fundamentally unfair. That conclusion rested on two, alternate grounds: first, that the government had correctly classified Almanza-Vigil's conviction as an aggravated felony; and second, that the government's decision to classify his conviction as an aggravated felony had not prejudiced him. And because a collateral attack can't survive the failure to meet any of § 1326(d)'s three conditions, the district court rejected Almanza-Vigil's challenge to the 2009 order's validity.

So the appeal begins with one question: Does Almanza-Vigil's conviction fit the INA's definition of an aggravated felony? Because we answer no, the appeal presents a second question: Did misclassifying the conviction so prejudice Almanza-Vigil that the entry of his previous removal order was fundamentally unfair? Because we again answer no, our inquiry ends there—we can uphold the dismissal of his collateral attack without reaching § 1326(d)'s other conditions.

B. **Is "Selling or Distributing" Methamphetamine an Aggravated Felony?**

The parties dispute whether Almanza-Vigil's conviction for "selling or distributing" methamphetamine, *see* Colo. Rev. Stat. § 18-18-405(a) (2006), qualifies as an aggravated felony under the INA—specifically, whether it meets the definition in 8 U.S.C. § 1101(a)(43)(B): "illicit trafficking in a controlled substance (as defined in [21 U.S.C. § 802]), including a drug trafficking crime (as defined in [18 U.S.C. § 924(c)])." We first explain how to compare a state offense to the INA's definition

12

of an aggravated felony. Then, we apply those principles to resolve the parties'

dispute.

### 1. The Categorical and Modified Categorical Approaches to Classifying Offenses

"When the government alleges that a state conviction qualifies as an

'aggravated felony' under the INA, we generally employ a 'categorical approach' to

determine whether the state offense is comparable to an offense listed in the INA."

*Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013) (citing *Nijhawan v. Holder*, 557 U.S.

29, 33–38 (2009); *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 185–87 (2007)). The

categorical approach asks whether the state offense's definition matches "the

'generic' federal definition of a corresponding aggravated felony." *Id.* (quoting

*Duenas-Alvarez*, 549 U.S. at 186). The state offense fits the generic offense only if it

"necessarily" includes the generic federal offense. *Id.* (quoting *Shepard v. United*

*States*, 544 U.S. 13, 24 (2005) (plurality opinion)). We therefore presume that the

state conviction rested on "'the least of th[e] acts' criminalized," then determine

whether the generic federal offense encompasses "even those acts." *Id.* at 190–91

(alteration in original) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010)).

"Whether the noncitizen's actual conduct involved such facts 'is quite

irrelevant.'" *Id.* at 190 (quoting *United States ex rel. Guarino v. Uhl*, 107 F.2d 399,

400 (2d Cir. 1939)). The categorical approach focuses on an offense's elements—the

"constituent parts" of its legal definition, "the things the 'prosecution must prove to

sustain a conviction.'" *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016)

(quoting *Elements of a Crime*, Black's Law Dictionary (10th ed. 2014)). If the defendant goes to trial, then the elements are "what the jury must find beyond a reasonable doubt." *Id.* (citing *Richardson*, 526 U.S. at 817). And if the defendant pleads guilty, then the elements are what he "necessarily admits." *Id.* (citing *McCarthy v. United States*, 394 U.S. 456, 466 (1969)). Elements are abstract, in contrast to "brute facts"—"mere real-world things[] extraneous to the crime's legal requirements," which "need neither be found by a jury nor admitted by a defendant." *Id.* (first quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999); and then citing *Fact*, Black's Law Dictionary (10th ed. 2014)).

When a state statute defines a single crime with a single—that is, indivisible—set of elements, the categorical approach is (relatively) "straightforward": just "line[] up that crime's elements alongside those of the generic offense and see[] if they match." *Id.* But this comparison gets more complicated when a state statute is divisible—that is, when it creates multiple crimes by listing multiple, alternative elements. *Id.* at 2249.[5]

When a statute lists alternative elements, the modified categorical approach allows us to glimpse "a limited class of documents" from the previous conviction—the indictment, the jury instructions, the plea agreement or colloquy—so that we can

---

[5] *Mathis* gives the example of a California law against "'the lawful or the unlawful entry' of a premises with intent to steal." 136 S. Ct. at 2249. This law creates "two offenses, one more serious than the other." *Id.* But only the more serious offense, involving unlawful entry, matches generic federal burglary. *Id.*

figure out which alternative "was integral to the defendant's conviction (that is, which was necessarily found or admitted)." *Id.* (citing *Shepard*, 544 U.S. at 26; *Taylor*, 495 U.S. at 602). Once we've discerned which crime, comprising which elements, the noncitizen was convicted of, we can "compare that crime, as the categorical approach commands, with the relevant generic offense." *Id.* But "the modified categorical approach serves—and serves solely—as a tool to identify the elements of a crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque." *Id.* at 2253 (citing *Descamps v. United States*, 570 U.S. 254, 263–64 (2013)). We can't "repurpose" it to explore whether a conviction, "even though for a too-broad crime, rested on facts (or otherwise said, involved means) that also could have satisfied the elements of a generic offense." *Id.* at 2254.

So, when we encounter a statute that lists alternatives, we face a threshold question: does the list enumerate alternative elements, which would allow us to use the modified categorical approach, or alternative means, which would not?

In *Mathis*, a state-court decision "definitively answer[ed]" the question whether Iowa Code § 702.12, which prohibits unlawful entry into "any building, structure, [or] land, water, or air vehicle," creates alternative crimes or illustrates alternative methods of committing the same crime. *Id.* at 2256. In *State v. Duncan*, the Iowa Supreme Court held that a jury need not unanimously agree on the burgled premises—there, either a boat or a marina—to convict the defendant of burglary; each location was an "alternative method of committing a single crime." 312 N.W.2d 519, 523 (Iowa 1981). Applying *Duncan*'s logic, *Mathis* concluded that the Iowa

15

statute's list of locations "[laid] out alternative ways of satisfying a single, locational element." *Mathis*, 136 S. Ct. at 2250, 2256.[6]

In other cases, the statute itself might resolve the means-or-elements question. *Id.* at 2256. If each alternative carries a different penalty, then to comply with *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the jury must unanimously agree on one of them, meaning that the alternatives must be elements. *Mathis*, 136 S. Ct. at 2256 (citing, among other state statutes, Colo. Rev. Stat. § 18-4-203 (2015), which distinguishes second-degree burglary of a dwelling, a class 3 felony, from second-degree burglary of any other "building or occupied structure," a class 4 felony). Other state laws may specify the contents of a charging document: what things prosecutors must charge (elements) and what things they need not charge (means). *Id.* (citing Cal. Penal Code § 952 (West 2008)).

In still other cases, though, state law might fail "to provide clear answers." *Id.* Then, the modified categorical approach permits us to glimpse the record of the previous conviction to determine whether the listed items are elements of the offense. *Id.* at 2256–57 (quoting *Rendon v. Holder*, 782 F.3d 466, 473–74 (9th Cir. 2015) (Kozinski, J., dissenting from the denial of rehearing en banc)). If these documents reference one alternative "to the exclusion of all others," that indicates the statute

---

[6] Compared to generic burglary, which protects any "building or other structure," Iowa burglary reached more places, like vehicles. *Mathis*, 136 S. Ct. at 2250 (quoting *Taylor*, 495 U.S. at 598). And because the offenses' locational elements didn't line up, *Mathis* concluded that the two did not categorically match. *See id.* at 2256–57.

16

lists several, alternative elements, each defining a separate crime. *Id.* at 2257. Then—

and only then—can we use the documents to identify the crime of conviction. *Id.*

"Conversely," though, if the indictment and jury instructions reiterate the statutory

list ("building, structure, or vehicle") or use "a single umbrella term" (like

"premises"), that indicates the statute lists alternative means of fulfilling one

element. *Id.* And if so, we have "no call to decide which of the statutory alternatives

was at issue in the earlier prosecution." *Id.* at 2256.

Next, we consider what this means for Almanza-Vigil.

### 2. Does Almanza-Vigil's Colorado Felony Categorically Match an Aggravated Felony Under the INA?

Almanza-Vigil argues that Colorado Revised Statutes § 18-18-405(1)(a)

(2006) sweeps too broadly to fit the generic federal offense at issue here—the

aggravated felony of "illicit trafficking in a controlled substance (as defined in

[21 U.S.C. § 802]), including a drug trafficking crime (as defined in [18 U.S.C.

§ 924(c)]." 8 U.S.C. § 1101(a)(43)(B).

The generic offense encompasses any offense (state or federal) that "proscribes

conduct punishable as a felony" under the Controlled Substances Act (CSA), Pub. L.

No. 91-513, 84 Stat. 1242 (1970) (codified as amended at 21 U.S.C. §§ 801–904).

*Lopez v. Gonzales*, 549 U.S. 47, 60 (2006); *see also Moncrieffe*, 569 U.S. at 188.[7] By

---

[7] To explain this conclusion, *Moncrieffe* noted that 18 U.S.C. § 924(c)(2) defines a "drug trafficking crime" as "any felony punishable under" three federal statutes, including the CSA, and that 18 U.S.C. § 3559(a)(5) classifies an offense as a "felony" if "the maximum term of imprisonment authorized" is more than a year.

comparison, the state statute that Almanza-Vigil pleaded guilty to violating, Colorado Revised Statutes § 18-18-405(1)(a) (2006), makes it unlawful "to manufacture, dispense, sell, distribute, possess, or to possess with intent to manufacture, dispense, sell, or distribute a controlled substance" (among other acts). As even the government concedes, the least of the acts criminalized—simple possession—is not a felony under the CSA. *See* 21 U.S.C. § 844(a) (setting a ceiling of a year's imprisonment for a defendant's first possession conviction); *accord Lopez*, 549 U.S. at 53. So, if the statute is indivisible, then Almanza-Vigil is correct—it doesn't match the generic offense.

But the government contends that the Colorado statute is divisible and that, under the modified categorical approach, Almanza-Vigil pleaded guilty to a crime the government terms "distribution of methamphetamine," which it claims "clearly constitutes" the generic federal crime of illicit drug trafficking. Appellee's Answer Br. at 26. We disagree.

Last year, two Tenth Circuit cases considered the scope of a "controlled substance offense," one of two categories of previous convictions that enhance the sentence of a "career offender" under the federal sentencing guidelines. *United States v. McKibbon*, 878 F.3d 967, 971–76 (10th Cir. 2017); *United States v. Madkins*, 866 F.3d 1136, 1144–48 (10th Cir. 2017); *see also* U.S. Sentencing Guidelines Manual § 4B1.1(a) (U.S. Sentencing Comm'n 2018). Like the INA's definition of a drug-trafficking offense, the guidelines' definition of a "controlled substance offense" encompasses all state or federal offenses (1) that are punishable

18

by more than a year's imprisonment and (2) that proscribe the "manufacture, import, export, distribution, or dispensing of a controlled substance," or the "aiding[,] . . . abetting, conspiring, [or] attempting to commit such offenses." U.S.S.G. § 4B1.2(b) & cmt. n.1. To this definition, *Madkins* and *McKibbon* hitched the CSA's definition of distribution: "delivery" of the controlled substance. 21 U.S.C. § 802(11); *see also McKibbon*, 878 F.3d at 972; *Madkins*, 866 F.3d at 1144.

Both decisions then compared that definition to the defendants' previous convictions: Madkins's convictions for the Kansas crimes of "possession with intent to sell, deliver, or distribute" cocaine and marijuana, and McKibbon's conviction for the Colorado crime at issue here (albeit a newer iteration, which had dropped simple possession from its list of proscribed acts). *Madkins*, 866 F.3d at 1145 (quoting Kan. Stat. Ann. §§ 65-4161(a), 65-4163(a)(3) (2001)); *McKibbon*, 878 F.3d at 971–74 (citing Colo. Rev. Stat. § 18-18-405(1)(a) (2014)). The *McKibbon* court noted that Colorado's uniform controlled-substances act defines a "sale" to include "a barter, an exchange, or a gift, *or an offer therefor*." Colo. Rev. Stat. § 18-18-403(1) (emphasis added); *McKibbon*, 878 F.3d at 971. Likewise, the *Madkins* court observed that Kansas law defines a "sale" to include an "offer to sell." 866 F.3d at 1145. Incorporating each state's definition of a "sale" into its proscription on "selling or distributing" a controlled substance, both *Madkins* and *McKibbon* determined that the states' drug laws swept in more conduct—including offers to sell a controlled substance—than fit within the guidelines' definition of a "controlled substance offense." *McKibbon*, 878 F.3d at 972; *Madkins*, 866 F.3d at 1145–46 (citing *United*

19

*States v. Hinkle*, 832 F.3d 569, 576–77 (5th Cir. 2017) (concluding that a similar Texas statute was broader than the guidelines' definition); *United States v. Savage*, 542 F.3d 959, 966 (2d Cir. 2008) (concluding that a similar Connecticut statute was likewise "overly inclusive")). And because the elements didn't line up, there was a categorical mismatch.

That was so, *Madkins* and *McKibbon* concluded, even though a "controlled substance offense" includes an attempt to distribute the controlled substance. *See* U.S.S.G. § 4B1.2 cmt. n.1. As *Madkins* explained, "an attempt to commit a crime requires the *intent* to commit the crime and *overt acts* in furtherance of that intent." 866 F.3d at 1147 (quoting *United States v. Taylor*, 413 F.3d 1146, 1155 (10th Cir. 2005)). Yet a person can offer to sell a controlled substance (an overt act) without intending to complete the sale. *Id.* Stated otherwise, an offer to sell can be fraudulent, "such as when one offers to sell the Brooklyn Bridge." *Id.* (quoting *Savage*, 542 F.3d at 965). Unless we read in limiting language (which is out of bounds during statutory construction), a state law that proscribes all "offers" to sell a controlled substance covers both the bona fide and the fraudulent. And because a fraudulent offer lacks "the intent to sell or distribute" that an attempt requires, a conviction for "selling or distributing" a controlled substance (in any state that defines "sale" to include all offers) criminalizes a broader swath of conduct than the guidelines' definition of a "controlled substance offense." *Id.* at 1148.

*Madkins* and (four months later) *McKibbon* thus both concluded that the guidelines' definition of a "controlled substance offense" excludes convictions under

20

state statutes that proscribe "offers" to sell a controlled substance. *McKibbon*, 878 F.3d at 972; *Madkins*, 866 F.3d at 1145. The least of the acts criminalized under such a state statute is a fraudulent offer to sell a controlled substance, which does not constitute a "controlled substance offense" under the guidelines. *Cf. Moncrieffe*, 569 U.S. at 191 (quoting *Johnson*, 559 U.S. at 137). So, "the two are not a categorical match." *Madkins*, 866 F.3d at 1147.

In reaching this conclusion, *McKibbon* addressed but rejected the government's contention (which it raises again here) that Colorado Revised Statutes § 18-18-405(1)(a) is divisible, "setting forth multiple elements of multiple criminal offenses, including manufacturing, dispensing, distributing, selling, or offering to sell a controlled substance." 878 F.3d at 974. If the government's argument were correct, then the court could have used the modified categorical approach to determine the offense to which McKibbon had pleaded guilty (and then compared that offense to the guidelines' definition). *Id.* But the court deemed the statute indivisible based on the Colorado Supreme Court's decision in *People v. Abiodun*, 111 P.3d 462 (Colo. 2005). *McKibbon*, 878 F.3d at 974–75. As *Mathis* suggested it might, the Colorado court's decision definitively answered the elements-or-means question—and its answer was "means." *Id.* at 974 (citing *Mathis*, 136 S. Ct. at 2256).

21

In *Abiodun*, the Colorado Supreme Court held that Colorado Revised Statutes § 18-18-405[8] defines a single offense for double-jeopardy purposes:

> Nothing in the specific language of the statute or the history of its enactment suggests an intent to create a separate offense for each proscribed act. On the contrary, the scope and structure of the proscriptive provision, combined with sentencing provisions differentiating punishments on the basis of the quantum of drugs (rather than the act) involved, strongly points to the creation of a single crime, the gravamen of which is preventing the unauthorized delivery of a "particular quantity of a particular contraband substance." . . . . Rather than completely separate offenses, the statute strongly suggests an intent to "criminalize successive stages of a single undertaking," . . . "encompass[ing] every act and activity which could lead to the proliferation of drug traffic."

111 P.3d at 466–67 (alteration in original) (citations omitted) (first quoting *Lopez v. State*, 108 S.W.3d 293, 299 (Tex. Crim. App.2003); then quoting *United States v. Mendoza*, 902 F.2d 693, 697 (8th Cir. 1990); and then quoting *United States v. Gomez*, 593 F.3d 210, 213 (3d Cir. 1979)). In *McKibbon*'s view, *Abiodun* squarely addressed divisibility by "holding that the state legislature intended to create a single unitary offense when it enacted the 'alternatively-phrased' § 18-18-405(1)(a)." *McKibbon*, 878 F.3d at 975 (quoting *Mathis*, 136 S. Ct. at 2249). Not only that, *McKibbon* added, *Abiodun* interpreted the Colorado statute to dole out the same punishments regardless of "whether a defendant manufactured or distributed or offered to sell a controlled substance." *Id.* (citing *Mathis*, 136 S. Ct. at 2256).

---

[8] *Abiodun* reviewed convictions that occurred sometime between 2001 and 2003, when the drug laws were the same as in 2006 (Almanza-Vigil's day)—and when § 18-18-405(1)(a) proscribed simple possession. *See People v. Abiodun*, 87 P.3d 164, 165 (Colo. App. 2003). The Colorado legislature struck simple possession only in 2010. *See supra* note 2.

Yet even if *Abiodun*'s message on divisibility were uncertain, *Mathis*'s final suggestion—"if state law fails to provide clear answers"—allowed the *McKibbon* court to "peek" at the record of the previous conviction. *Id.* at 976 (quoting *Mathis*, 136 S. Ct. at 2256–57). And there, the court saw that McKibbon had pleaded guilty to violating Colorado Revised Statutes § 18-18-405(1)(a) by "either selling or distributing heroin." *Id.* So under *Mathis*, the court concluded, McKibbon's previous record indicated that "selling or distributing" a controlled substance were alternative means of committing a single, indivisible offense. *Id.* (citing *Mathis*, 136 S. Ct. at 2248).[9]

*Madkins* and *McKibbon* thus crafted a general rule: if state law criminalizes fraudulent offers to sell a controlled substance, then a conviction under that state law is a categorical mismatch for the guidelines' generic "controlled substance offense." Here, we take their logic another step, into the immigration context. Like the generic "controlled substance offense" under the guidelines, the generic offense of "illicit trafficking in a controlled substance" under the INA encompasses all state offenses that are felonies under the CSA. *Compare Lopez*, 569 U.S. at 60 (defining the scope of "illicit trafficking in a controlled substance" under 8 U.S.C. § 1101(a)(43)(B),

---

[9] *Madkins* also addressed divisibility, but it deemed the Kansas statutes divisible. 866 F.3d at 1145 (discussing Kan. Stat. Ann. §§ 65-4151(a), 65-4163(a)(3)). That didn't matter in the end, though, because Madkins had pleaded guilty to possession with intent to sell cocaine and marijuana. *Id.* And the court determined that under Kansas law, these offenses covered possession with the intent to *offer* to sell cocaine and marijuana. *See id.*

23

*with McKibbon*, 878 F.3d at 972, *and Madkins*, 866 F.3d at 1144 (defining the scope of a "controlled substance offense" under U.S.S.G. § 4B1.2(b)). And according to *Madkins* and *McKibbon*, the felony offenses of distribution and attempted distribution under the CSA exclude fraudulent offers to sell. *See* 21 U.S.C. §§ 802(11), 802(8), 841(a)(1) (prohibiting only the actual or attempted delivery of a controlled substance). So, a state statute that proscribes all offers to sell a controlled substance, including fraudulent ones, criminalizes more conduct than (and is a categorical mismatch for) the INA's definition of "illicit trafficking in a controlled substance." *See* 8 U.S.C. § 1101(a)(43)(B).

As for the state statute at issue here, *McKibbon* further tells us that Colorado Revised Statutes § 18-18-405(1)(a) is indivisible—at least to the extent that "selling or distributing" a controlled substance are alternative means of committing a single offense. *McKibbon*, 878 F.3d at 974; *see also id.* at 976. *McKibbon* thus specifically rejected the argument that the government makes here: that we can use the modified categorical approach to define Almanza-Vigil's crime of conviction more narrowly, as "distributing" methamphetamine. *See id.* at 974–76.

And like in *McKibbon*, even if we do use the modified categorical approach to "peek" at the record of Almanza-Vigil's previous conviction, we see that he was convicted of "selling or distributing" methamphetamine. Of the six counts in the complaint, he pleaded guilty to the first:

COUNT 1 - DISTRIBUTION OF A CONTROLLED SUBSTANCE -
SCHEDULE II (F-3)

24

> On or About September 15, 2006, OSCAR ALMANZA-VIGIL unlawfully, feloniously, and knowingly sold or distributed METHAMPHETAMINE, a schedule II controlled substance; in violation of section 18-18-405(1),(2)(a)(I)(A), C.R.S.

Suppl. R. vol. 2 at 3 (bolding removed). And according to *Mathis*, when an indictment reiterates the statute's alternatives (here: "sold or distributed"), it's "as clear an indication as any that each alternative is only a possible means of commission, not an element that the prosecutor must prove to a jury beyond a reasonable doubt." 136 S. Ct. at 2257. Nor does it matter that when pressed for space, the state-court judgment labeled the charge "Controlled subst-Distribute." Suppl. R. vol. 2 at 5. The modified categorical approach limits our record inquiry "to the terms of the charging document, the terms of a plea agreement or transcript of colloquy . . . , or to some comparable judicial record of this information." *Shepard*, 544 U.S. at 26; *see also Mathis*, 136 S. Ct. at 2249. And here, the charging language in count one shows that Almanza-Vigil pleaded guilty to "selling or distributing" methamphetamine. Suppl. R. vol. 2 at 3.

Accordingly, it doesn't matter whether we apply the categorical approach or the modified categorical approach. Either way, Almanza-Vigil's crime of conviction is "selling or distributing" a controlled substance in violation of Colorado Revised Statutes § 18-18-405(1)(a). And because that crime comprises fraudulent offers to sell a controlled substance, it does not categorically match the aggravated felony of "illicit trafficking in a controlled substance . . . , including a drug trafficking crime." 8 U.S.C. § 1101(a)(43)(B). *Cf. McKibbon*, 878 F.3d at 976.

25

That leaves a final question: Even though the government misclassified Almanza-Vigil's Colorado conviction as an aggravated felony, which resulted in expedited removal proceedings and the denial of any opportunity for discretionary relief, can he additionally show that the entry of his previous removal order was "fundamentally unfair"? 8 U.S.C. § 1326(d)(3).

**C.      Did Misclassifying Almanza-Vigil's Colorado Conviction Render the Entry of his 2009 Removal Order Fundamentally Unfair?**

Almanza-Vigil argues that the government's misclassification of his Colorado conviction as an aggravated felony prejudiced him because, outside expedited removal proceedings, he could have applied for and received relief from removal, such as voluntary departure or cancellation of removal.[10]

In *Aguirre-Tello*, we required a noncitizen alleging that the entry of a previous removal order was fundamentally unfair to meet a reasonable-likelihood standard. 353 F.3d at 1209; *see also* 8 U.S.C. § 1326(d)(3). To demonstrate fundamental unfairness, the noncitizen must establish a reasonable likelihood that, but for the

---

[10] We agree with Almanza-Vigil that *S.E.C. v. Chenery Corp.* would bar us from upholding his removal order on grounds different from those stated in that order. *See* 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."). But 8 U.S.C. § 1326(d)(3) prohibits us from addressing the removal order itself unless Almanza-Vigil can establish that the order's entry was fundamentally unfair. And as Almanza-Vigil's arguments throughout this case show, the fundamental-unfairness inquiry hinges on Almanza-Vigil's chances of receiving relief from removal.

complained-of error, he would have avoided removal. *Aguirre-Tello*, 353 F.3d at

1208 (quoting *United States v. Calderon-Pena*, 339 F.3d 320, 324 (5th Cir. 2003)).

But in a footnote, *Aguirre-Tello* noted "the inherent difficulty in demonstrating

prejudice from the denial of eligibility for discretionary relief." *Id.* at 1209 n.8 (citing

*Mejia Rodriguez v. Reno*, 178 F.3d 1139, 1148 (11th Cir. 1999)). The *Aguirre-Tello*

court quoted *Mejia-Rodriguez*, where the Eleventh Circuit warned:

> An alien's actual chances of receiving such discretionary relief
> [suspension of deportation][11] are too speculative, and too far beyond the
> capability of judicial review, to conclude that the alien has actually
> suffered prejudice from being ineligible for suspension of
> deportation . . . . Just as a court cannot review the inherently 'subjective'
> judgments made by the executive in deciding whether to commute a life
> sentence, this Court cannot predict the subjective and fact-intensive
> judgments that the Attorney General would make in deciding whether to
> grant extraordinary relief, such as the suspension of deportation . . . . The
> alien cannot demonstrate prejudice, much less substantial prejudice,
> arising from the ineligibility for such an 'act of grace' because no
> standards exist for a court to determine whether the executive would have
> granted the extraordinary relief anyway.

*Id.* (quoting *Mejia-Rodriguez*, 178 F.3d at 1148).

At the threshold, we disagree with the district court that Almanza-Vigil's odds

of receiving "an 'act of grace' in the form of discretionary relief" present an inquiry

"too speculative" for judicial examination. R. vol. 1 at 470 (quoting *Aguirre-Tello*,

353 F.3d at 1209 n.8). *Aguirre-Tello* itself did not consider the petitioning

---

[11] Under the current statutory scheme, "suspension of removal" corresponds to
cancellation of removal under 8 U.S.C. § 1229b. *See* Immigration and Naturalization
Act § 244, Pub. L. No. 82-414, 66 Stat. 163, 8 U.S.C. § 1254 (1994) (repealed).

27

noncitizen's claim too speculative, despite hinting at the "inherent difficulty" of success. 353 F.3d at 1209 n.8. Instead, the court explored the likelihood that he could have received "a § 212(c) waiver[12] from deportation." *See id.* at 1209–10. Accordingly, we will, too.

We turn to whether, absent the government's misclassification of his Colorado conviction as an aggravated felony, Almanza-Vigil had a reasonable likelihood of receiving either cancellation of removal or voluntary departure.

### 1. Cancellation of Removal

The INA gives the Attorney General discretion to cancel the removal of an otherwise-removable, non-permanent-resident "alien" who:

(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [his] application [for cancellation of removal];

(B) has been a person of good moral character during such period;

(C) has not been convicted of an offense under [8 U.S.C. §§ ]1182(a)(2) [including "any law or regulation of a State . . . relating to a controlled substance (as defined in section 802 of Title 21)"], 1227(a)(2) [including an aggravated felony or "any law or regulation of a State . . . relating to a controlled substance"], or

---

[12] Before Congress enacted the Antiterrorism and Effective Death Penalty Act (AEDPA), section 212(c) of the INA, codified at 8 U.S.C. § 1182(c), gave the Attorney General broad discretion to waive deportation for resident noncitizens. *See INS v. St. Cyr*, 533 U.S. 289, 294–95 (2001). In 1996, AEDPA "reduced" the class of noncitizens eligible for such discretionary relief by identifying "a broad set of offenses for which conviction would preclude such relief." *Id.* at 297. Later that year, Congress passed the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996, which repealed 8 U.S.C. § 1182(c) and created 8 U.S.C. § 1229b, permitting "cancellation of removal" for a much narrower class of resident noncitizens. *Id.*

28

> 1227(a)(3) [failure to register and falsification of documents] . . . ; and
>
> (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1229b(b)(1).

Almanza-Vigil claims that, "had the relevant officials realized his conviction was not an aggravated felony," he would have had a reasonable likelihood of receiving cancellation of removal. Appellant's Brief-in-Chief at 37. He submits the testimony of his immigration-law expert, Mr. Olsi Vrapi, a "Criminal immigration" law professor at the University of New Mexico School of Law and a practicing attorney who has represented hundreds of noncitizens in immigration proceedings. R. vol. 1 at 186:20. At the motion-to-dismiss hearing, Vrapi said that Almanza-Vigil was "eligible for this form of relief" despite having pleaded guilty to "selling or distributing" methamphetamine. R. vol. 1 at 206:25–207:1.

We disagree. Though "selling or distributing" methamphetamine is not an aggravated felony under the INA, it does violate "a[] law or regulation of a State . . . relating to a controlled substance," namely, Colorado Revised Statutes § 18-18-405(1)(a). 8 U.S.C. §§ 1182(a)(2), 1227(a)(2). Almanza-Vigil's Colorado conviction thus qualifies as an offense under both § 1182(a)(2) and § 1227(a)(2), which would have disqualified him from receiving cancellation of removal under 8 U.S.C. § 1229b(b)(1)(C).

29

### 2. Voluntary Departure

Compared to cancellation of removal, voluntary departure is available to a broader class of noncitizens. The INA excludes only aggravated felons, 8 U.S.C. § 1227(a)(2)(A)(iii), those engaged in terrorist activities, *id.* § 1227(a)(4)(B), and some noncitizens "previously permitted to so depart," from this form of relief. *See id.* §§ 1229c(a)(1), 1229c(c). Any other noncitizen may seek permission to depart at his own expense instead of commencing, or before completing, removal proceedings. *See id.* § 1229c(a)(1). Alternatively, at the end of removal proceedings, a noncitizen who meets certain conditions may seek an order from the immigration judge "granting voluntary departure in lieu of removal." *Id.* § 1229c(b)(1). To receive such an order, the "alien" must:

    (A) . . . [have] been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served . . . ;

    (B) . . . [be, and have] been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

    (C) . . . not [be] deportable under section 1227(a)(2)(A)(iii) [aggravated-felony convictions] or section 1227(a)(4) [security-related grounds, including terrorist activities] . . . ; and

    (D) . . . establish[] by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

*Id.*; *see also* 8 C.F.R. § 1240.26.

Almanza-Vigil's Colorado conviction was not an aggravated felony, and nothing in the record suggests that he poses a national-security risk. So, we agree with Almanza-Vigil that even with his criminal record, he was eligible to receive

30

voluntary departure in 2009, at least before the completion of removal proceedings.[13]

But we disagree that he was reasonably likely to receive it. *See Aguirre-Tello*, 353 F.3d at 1209.

In exercising their discretion to grant or deny a voluntary-departure application, immigration judges balance the applicant's positive equities, like lengthy residence in the United States and close ties to family here, against negative factors, like an unfavorable immigration history or a criminal record, and then decide whether the applicant is worthy of an exercise of discretion. *See Matter of Gamboa*, 14 I & N. Dec. 244, 248 (BIA 1972); *accord United States v. Valdez-Novoa*, 780 F.3d 906, 917–21 (9th Cir. 2015) (applying *Gamboa*'s balancing principle in the context of § 1326(d)'s fundamental-unfairness prong).

Almanza-Vigil, bolstered by Vrapi's testimony, asserts that an immigration judge considering the equities of his case would have found him worthy of voluntary departure. He had grown up in the United States since age eight; he had learned English, graduated from high school, and worked a steady job; and he had many

---

[13] Had Almanza-Vigil received voluntary departure either before the end, or at the end, of the removal proceedings, the immigration judge would have entered an "alternate order of removal." 8 C.F.R. § 1240.26(d); *see also* 8 U.S.C. § 1229c(b)(1). Neither party addressed how such an order might affect subsequent illegal-reentry proceedings. But had Almanza-Vigil returned after the entry of such an order, he would have "departed the United States while an order of exclusion, deportation, or removal [wa]s outstanding, and thereafter . . . enter[ed] . . . the United States," thus violating 8 U.S.C. § 1326(a). (He would not, though, be subject to the twenty-year maximum prison sentence for those "whose removal was subsequent to a conviction for commission of an aggravated felony." 8 U.S.C. § 1326(b)(2).)

31

citizen and lawful-permanent-resident family members, including a son born here. His "only negative equity" was his conviction for "selling or distributing" methamphetamine. Appellant's Brief-in-Chief at 35. And Vrapi told the court that with the counterweight of his positive factors, Almanza-Vigil "had a reasonable likelihood of receiving" voluntary departure despite this conviction. R. vol. 1 at 212:17–18. Voluntary departure, Vrapi explained, was "fairly easy" to get and "fairly typical to be granted," absent "some egregious circumstance" (like "[p]rior violations of other voluntary returns," "disregard of border laws," or "criminal acts"). *Id.* vol. 1 at 211:21, 211:25–212:1, 212:4–7. Though he couldn't give numbers, Vrapi said that his clients had "gotten voluntary departure, even with felonies." *Id.* vol. 1 at 212:12– 13.

In further support, Almanza-Vigil cites cases in which noncitizens with criminal records worse than his have won this form of relief. In his best example, *In re: Luis Alonzo Gonzales-Figueroa*, the Board of Immigration Appeals upheld an immigration judge's decision to grant voluntary departure to an applicant with "numerous arrests," four assault convictions (the last of which sent him to prison for six months), and one resisting-arrest conviction. 2006 WL 729784, at *1 (BIA Feb. 10, 2006). Considering Gonzales-Figueroa's countervailing positive equities, like his lengthy residence in the country, his participation in Alcoholics Anonymous, and the testimony of his mother and sister, both U.S. citizens, that he had quit drinking and helped his mother pay the bills, the board ruled that the immigration judge had not abused his discretion. *Id.* at *1–2.

32

But as the Ninth Circuit observed in *Valdez-Novoa*, "a single case that is arguably on point means only that it is 'possible' or 'conceivable' that a similarly situated alien would be afforded voluntary departure." 780 F.3d at 920. The same point dampens Vrapi's helpfulness here. Vrapi could not quantify Almanza-Vigil's chances, nor could he describe any case in which an immigration judge had allowed someone convicted of "selling or distributing" methamphetamine to depart voluntarily. Vrapi's conclusory assertions that voluntary-departure relief is "fairly" likely overall and would have been "reasonably" likely in Almanza-Vigil's case cannot substitute for such empirical or anecdotal evidence. (Tellingly, Vrapi was unfamiliar with the *Aguirre-Tello* decision.) Our reasoning parallels the analysis in *United States v. Reyes-Alvares*, which involved the same expert witness and a similar fact pattern. No. CR 15-4121 KG, 2016 WL 10720854, at *1, *5 (D.N.M. Feb. 19, 2016). There, the district court found Vrapi's examples distinguishable from the case at bar, so it discounted his testimony "that 'IJs 'hand[ ][voluntary departures] out like candy.'" *Id.* at *6–7 (alterations in original). Even added to decisions like *Gonzales-Figueroa*, Vrapi's testimony here establishes only the possibility that Almanza-Vigil might have received voluntary departure had his Colorado conviction been properly classified; it doesn't establish a reasonable likelihood.

Almanza-Vigil has close ties to this country, including a U.S.-citizen son, but in 2009, when the government issued his removal order, he had just been released from prison for "selling or distributing" methamphetamine—a serious crime in the colloquial sense, if not technically an aggravated felony under the INA. *See* 8 U.S.C.

33

§ 1101(a)(43)(B). And unlike the applicant in *Gonzales-Figueroa*, Almanza-Vigil offered no evidence of rehabilitation. *See* 2006 WL 729784, at *1–2. As a result, he can't meet his burden of showing a "reasonable likelihood that, in deciding who is deserving of discretionary relief from deportation among the many aliens eligible for such relief, the Attorney General would grant relief to one so recently convicted of such a serious . . . crime." *Aguirre-Tello*, 353 F.3d at 1209.

We agree with the district court that Almanza-Vigil failed to satisfy the fundamental-unfairness prong of 8 U.S.C. § 1326(d)(3). And without satisfying that condition, the INA precludes him from collaterally attacking his 2009 removal order in the illegal-reentry prosecution. *See* 8 U.S.C. § 1326(d).

## CONCLUSION

For these reasons, we affirm the district court's judgment.